Mary Jordan **KANTARIS**, Appellee,

v.

Gus James **KANTARIS**, Appellant.

No. 53395.

Supreme Court of Iowa.

July 24, 1969.

William Pappas, Mason City, for appellant.

Ray E. Clough, Mason City, for appellee.

STUART, Justice.

This is an appeal by defendant from the judgment of the trial court which granted plaintiff a decree of divorce, custody of the children, child support and alimony. It provided for visitation and settled property rights.

This divorce action has been more frustrating and depressing than most. The record is long, the disputes between the parties were bitter, the exchanges between the attorneys and the court were sometimes heated, and the use of loud and profane language by both parties has been emphasized. It involves the second marriage between these parties and might have been avoided if defendant had acted sensibly.

As there is little precedent value to the facts in divorce cases and as their recitation in this instance would unduly lengthen the opinion, we will omit many details and state only the facts and conclusions necessary to express our overall impressions of this case. Those facts relating to defendant's propositions for reversal will be set forth where appropriate.

Plaintiff and defendant were first married in 1952. She was 18. He was 27 and had been married and divorced previously. They had 4 children. Defendant owns a laundry from which he has earned $27,000 to $40,000 per year. They were divorced in September 1964. Plaintiff was awarded custody of their four children, child support of $500 per month, $5,000 cash and a Ford Thunderbird automobile.

Immediately after the divorce, defendant embarked on a campaign to get plaintiff to remarry him, although his tactics were not likely to engender endearing love. Mary had invested the $5,000 in a home for herself and the children. Gus refused to stay away from that home. He was there several times everyday making protestations of his love for plaintiff and the children. He often stayed at night, even for extended periods. There is no evidence of sexual relations between the parties during this period.

Defendant checked on her associates and objected when she went out and did not come home when he thought she should. When he learned plaintiff had had a weekend affair with a mutual male acquaintance he threatened court action to have her declared an unfit mother. As a consequence, on December 23, 1964, she signed an agreement giving defendant custody of the chil-

dren and title to the home. She kept the Thunderbird. The agreement was not filed at that time but defendant held it over her head to compel her to do as he wished.

For a part of the time between the marriages plaintiff lived in California with her mother. Defendant showered her with gifts, telegrams and telephone calls. During a period of time when defendant was married to, but separated from a prostitute, he wanted plaintiff to return to Mason City and live as his paramour.

In August 1965 defendant went to California. A quarrel ensued and he returned to Mason City with the children. The agreement signed in December was filed and approved by the court.

Although plaintiff started an action for the custody of the children in September, the hearings were never completed and they lived with their father until the middle of June in 1966. Defendant refused to let the children visit their mother in California but rented a cottage at Clear Lake for a month. Plaintiff came to the cottage and she and defendant lived together as husband and wife with their children. At the end of the month, they moved to the home in Mason City which plaintiff had purchased after the divorce and continued to live as a family.

By July 26, 1966, plaintiff had become so nervous and distraught her psychiatrist sent her to the hospital for four days. At the end of this period she went to stay with the Smiths, family friends. All during this period of time defendant continued his incessant pleading for their remarriage. With Mr. Smith acting as intermediary, plaintiff agreed to remarry defendant after he promised to refrain from certain conduct which had been a source of irritation during their first marriage and which continued when they were together after the divorce. A brief reference to these matters is pertinent.

During the first marriage Mary had helped at the laundry and kept books. Gus blamed her when anything went wrong.

He agreed she would not have to work at the laundry and he would not bring his business problems home.

Gus was able to get away from the laundry many times during the day and he would come home and often bring friends home for coffee. He agreed that each should be able to have their own friends and that he would not always be "under her feet".

Gus talked in a loud voice and habitually used vulgar and obscene language. He agreed to try and control his voice and not use improper language in the presence of his wife and children.

Both agreed not to bring up the other's past improper conduct.

Plaintiff did not like Mason City because of her many unpleasant personal experiences there. Gus agreed to sell the laundry and move to California.

Plaintiff testified although she questioned whether defendant would keep his promises, she entered into the second marriage in a good faith effort to reestablish a home for the children. They were remarried August 8, 1966.

None of the promises were kept. Defendant does not seem to be able to control himself. He is an emotional, short-tempered, demanding person. His conduct at times has been highly irrational. When anything went wrong or he did not get his way he blamed plaintiff and embarked on a tirade which cannot be described adequately in words. We, and the trial court, had the benefit of tape recordings taken without defendant's knowledge at the suggestion of plaintiff's attorney. His counsel concedes he would be a most difficult person to live with. The appeal is not a defense of defendant, but an attack upon plaintiff.

I. Defendant's first proposition for reversal is that plaintiff's own conduct bars her from a divorce because: (A) She knew defendant's traits, personality and past conduct and, when she remarried him, she as-

sumed the risk they would not be changed. (B) She is a coarse, obscene and vulgar woman and it is not cruel and inhuman to speak vulgarly about a person who uses such language herself. (C) She was as much at fault as defendant.

A. As plaintiff had associated with the man she was remarrying since 1952, she knew his personal traits and character. This fact was properly given consideration in Baker v. Baker, 252 Iowa 1161, 1165, 1168, 110 N.W.2d 236, 238, 240, and Main v. Main, 168 Iowa 353, 356–357, 150 N.W. 590. Here, plaintiff knew defendant so well she obtained promises from him that he would change before agreeing to the remarriage. This puts an entirely different light on the matter. It is true that failure of consideration is not grounds for divorce, Main v. Main, 168 Iowa 353, 358–359, 150 N.W. 590, but a good faith attempt to reestablish a marriage should not be discouraged because of a wife's knowledge of her husband's faults. She claims she had the sincere hope that defendant would honor his promises and act differently for the sake of their children. Defendant questions her good faith. While it is not beyond reason that she remarried him to get a new custody and property arrangement, the trial court believed she acted sincerely and we agree.

No one contends these promises were not made. Parents with minor children should be encouraged to try to keep the family together. Attempts at reconciliation would be hampered if promises to refrain from conduct which ordinarily would be grounds for divorce could be broken with impunity after remarriage. We believe plaintiff entered into the second marriage with the good faith expectation that defendant would change his ways and she should not be denied a divorce when he failed to do so because of her knowledge of his past conduct.

B. There is evidence plaintiff used worse language toward her husband than he used toward her. The frequency and time are in dispute. Plaintiff claims the admitted occasions were brought about by the frustrating, irritating and harassing diatribes and actions of her husband. We believe this is true. Tony, their 15 year old son, who was not friendly toward his mother and wanted to live with his father, testified his mother did not use improper language in front of the children. Her witnesses testified it occurred in response to the tirades of defendant. We are inclined to believe her use of such language tends to show the extreme state of exasperation to which defendant's conduct had driven her rather than the customary use of vulgar language.

Conceding plaintiff may not be "made of that delicate moral fibre which characterizes those whom hard words can kill", Main v. Main, 168 Iowa 353, 358, 150 N.W. 590, 592, there is more involved here than vulgar language. A person who is not shocked by such language can be disturbed when it is abusively directed toward her. The verbal harassment to which, we are convinced, plaintiff was subjected at all hours of the day and night would be devastating even if acceptable language were used. The fact that plaintiff was used to hearing, and on occasion using, profanity does not mean defendant's conduct disclosed by the record was not cruel and inhuman treatment toward her.

In Marsh v. Marsh, 64 Iowa 667, 669, 21 N.W. 130, 131, the wife was accused of worse conduct than in the instant case. We said: "We do not deem it necessary to refer to the other evidence, which tends, in a greater or less degree, to corroborate that of plaintiff, whose conduct has not been entirely blameless. On the contrary, we are forced to believe, from the evidence that she is a vulgar woman, and in some respects a fit match for her husband; but no good could possibly result if we should deny a divorce, and it might be that harm would result if these parties should, in the future, be compelled to sustain towards each other the relation of husband and wife. We do not think that the conduct of

the plaintiff has been such that we would be justified in holding that because of such conduct she is not entitled to a divorce."

C. Defendant points to proof of plaintiff's use of profane language, the admitted fact she had sexual intercourse with defendant after the divorce petition was filed and her statement she didn't love defendant when she remarried him as support for his contention she did not come into equity with clean hands and is subject to the doctrine of recrimination and condonation.

■ We have already discussed plaintiff's use of profanity. We do not believe the record supports the bald statement she didn't love Gus at the time of the remarriage. She testified:

"This second time, before we were remarried, I can't say in words I love you and expect it to be what Gus expected it to be. I had a certain feeling for Gus, I had lived with him Lord knows for 12 years, I had four children with him and you don't throw this out the window, it's not a feeling like the first time when I married him, when I couldn't wait for him to come home from work, when I look forward to being able to do things with him, I was 33 years old when I remarried him, it wasn't what you see in the movies—to say I love you or I don't love you and have it interpreted the way it's meant, I don't know how I can explain it."

We believe she was making an honest attempt to express her emotions and evaluate their relationship at the time of the remarriage.

Plaintiff concedes she and defendant had sexual intercourse two or three times a month from the time the divorce action was filed until one week of the trial. She claims it was not voluntary but to stop his harassing tirades so she and the children could get some rest. Defendant claims their sexual relations occurred with much greater frequency and that plaintiff was a willing partner.

■ After evaluating the testimony and listening to the tapes we accept her explanation as the true one. Defendant interpreted plaintiff's attempts to be pleasant as an indication she would sleep with him. When she would go to bed in their girls' room he would commence his harassing and accusatory conduct sometimes extending to two or three o'clock in the morning. On occasions the girls begged their mother to go to bed with their daddy so they could get some sleep. Some of the most violent displays of defendant's temper and his disdainful attitude toward plaintiff occurred in the girls' room and in their presence. When she would give in to him, he would quiet down for a few days. We do not consider the submission to sexual relations under these circumstances willing and voluntary so as to constitute condonation. Erickson v. Erickson, Iowa, 154 N. W.2d 106, 111–112; Payton v. Payton, 252 Iowa 772, 775, 779, 108 N.W.2d 358, 359–360, 362; Duwe v. Duwe, 246 Iowa 1336, 1344, 72 N.W.2d 501, 506.

■ The trial court was reluctant to issue an order restraining defendant from living in this home, but from the circumstances here, it appears such an order would have been justified.

We cannot agree plaintiff's conduct was such as to bar her from a divorce. We are convinced plaintiff's improper actions during her marriage to defendant were precipitated by defendant's conduct toward her. She struck back in kind when she could no longer stand it.

■ II. Defendant argues proof failed to show cruel and inhuman conduct endangered plaintiff's life. There is no merit in this proposition. In addition to the usual testimony by plaintiff and her witnesses as to the effect upon her nerves and appearance, there is the testimony of a psychiatrist who had attended her for several years including a time prior to the first divorce. We set out excerpts from his testimony.

"In my opinion as a result of this marriage, Mary Kantaris went from what would appear to be a relatively happy person to a cynical, sour, depressed type of person, and I think her husband's treatment had an effect on her health. His constant haranguing, calling names, ripping the telephone out and his threats to destroy the laundry if she would divorce him have made her nervous, upset, depressed and cynical, and in my opinion these headaches of hers have resulted from her husband's treatment of her.

"If she remained married to Gus, things would have to get better if she were to get better. I don't think it would do her any good if things continue as they have.

"I don't know what the result would be if this marriage would continue as it has in the past. I don't think Mary could stand it."

"In my opinion, her suffering from depressions, headaches, and nervousness would get better upon the removal of Gus from her environment. I think her symptons are caused by the way Mr. Kantaris acts."

"Q. If she were to remain married to Gus under the circumstances that she is now, do you think it would endanger her life? A. Who can tell. Could. She could commit suicide. That's one way out.

"Q. Well, you said who can tell. Will you explain that? A. I'm not God.

"Q. Well, do you know one way or the other? A. No, I wish I did, I would do a much better job with my patients.

"Q. Then your answer is you do not know? A. I don't know if she would commit suicide or not. It is a very good possibility with someone who is upset and depressed and wants out.

"Q. The question I asked you is whether or not if she remained married to Gus under the circumstances that exists right now or have existed since August 8th, 1966, if it would be dangerous to her life?

"Mr. Clough. This is objected to as mere repetition, harassment of this witness. He has answered that question. He just got through answering that question, Your Honor, pure repetition.

"A. Yes, it could endanger her life.

"Q. Now how could it endanger her life? A. Because she is depressed.

"Q. All right, and on what do you base this opinion, doctor? A. Because I have talked to her.

"Q. And when did you talk to her? A. October 9th, 1967.

"Q. Now let me ask you this. If Mary Kantaris since August 8th, 1966, did not find it necessary to come to your office or to consult you on a professional basis about anything that was wrong with her, is it your opinion and are you going to tell this court that she was in some difficulty with being depressed? A. She certainly was, she has called and I told her there wasn't much use in seeing me if the same old business was going on."

Defendant claims the testimony is worthless because plaintiff did not consult with the doctor professionally after the second marriage. We believe there is value in such testimony under the facts of this case. The evidence shows defendant pursued with more vigor than before the same type of conduct which had caused plaintiff difficulty when she was consulting the witness. The doctor was thoroughly familiar with the effect of such conduct on plaintiff and advised her during the second marriage he could do nothing more for her if the situation was unchanged. There was substantial evidence that his conduct was affecting her health and endangering her life.

III. Defendant urges that the trial court erred in refusing to consider the testimony of Tom Jolas on the ground it was privileged under the attorney-client relationship. His testimony was offered to rebut plaintiff's claim defendant had Mr. Jolas prepare the agreement changing custody of

the children and that she was not represented by counsel at that time. She had also testified Jolas called to tell her he was filing the agreement in August 1965.

In the offer of proof Jolas testified plaintiff contacted him about drawing the agreement and said she didn't want anything that belonged to Gus including the children except transportation "to get the hell out of here." He told her to think it over and that he would not file the agreement but would keep it in the file. He also offered to testify she called him in August and told him to file the agreement. The record is not clear whether this took place while Gus was in California or after he returned to Iowa, but the date of the filing makes it likely Gus was in California when the call was made.

■ A client waives objection to an attorney's testimony when the client testifies to the communications. Knigge v. Dencker, 246 Iowa 1387, 1396, 72 N.W.2d 494, 499. There we approved Kelly v. Cummens, 143 Iowa 148, 151, 121 N.W. 540, 541, where we said:

"* * * a client who goes upon the stand in an attempt to secure some advantage by reason of transactions between himself and his counsel waives his right to object to the attorney's being called by the other side to give his account of the matter. Any other rule would subject the lawyer to any kind of scurrilous and unjust attack, and convert the statute from being a mere shield into a weapon of offense."

"In Jacobs v. City of Cedar Rapids, 181 Iowa 407, 410, 411, 164 N.W. 891, 892, plaintiff testified on cross-examination: "I did not consult any doctors in regard to my health before my accident." We said: "We are of the opinion that when plaintiff testified, though on cross-examination, that no relation existed upon which the claim of privilege could rest, she settled, at least for that trial, that her objection was not well taken."

■ Plaintiff does not argue here that the trial court was correct but points out

our review is de novo and the evidence is before us for consideration. If we accept Mr. Jolas' testimony as the more accurate version, it does not affect our result here. These conversations and actions occurred while she was being harassed by Gus. We interpret her action as exemplifying the state of despair to which she had been driven by his tactics. She was willing to give up everything to get away from him when she had the agreement prepared. At the time it was filed, she wanted to escape the threats he was making by holding it over her head.

Not one other thing in the record supports the accusation she did not care for her children. She stayed in Mason City for several months after the agreement was signed putting up with Gus to keep her children. Less than a month after the children were taken from her, she filed an application to regain their custody.

■ IV. Defendant claims he is entitled to a new trial because of trial court's misconduct and prejudice. The trial court was unable to conceal his irritation with defendant and injected himself into the trial more than he should have. His irritation is understandable. Defendant's counsel also became impatient with his client.

We have reviewed the record de novo and have reached our decision on the record without regard to the trial court's ill advised remarks. Defendant is his own worst enemy. His conduct ruined his marriage. The fact that his case has been looked upon with disfavor is due to the record rather than unfounded prejudice.

V. Defendant also claims the alimony and property settlement allowed by the trial court are unfair and unreasonable. The trial court awarded plaintiff child support of $100 per month for each of the three girls. Defendant was also required to pay the premiums on $1000 endowment policies for the girls of which plaintiff was the named beneficiary. Plaintiff was given $200 per month permanent alimony, $100

of which was to continue if she remarried "in recognition of plaintiff's contribution to the estate, worth and business of defendant". She also received $5300 cash and the home at 1029 Park Lane with an equity of about $7000. Defendant was required to make monthly payments of $150.14 on said house.

■■■■ All members of the court participating in this decision, with the exception of the writer,[1] are of the opinion the trial court's division of the property and award of alimony were fair and reasonable, with one slight modification. The majority believes the entire $200 per month alimony should terminate in the event of plaintiff's remarriage or death.

This is not the usual case of a marriage of short duration. The fact that this divorce follows a remarriage of these parties is an important circumstance existing at the time of the second divorce. Plaintiff has three young daughters to look after. This is a circumstance which affects her opportunity for employment, ability to accumulate property and the possibility of remarriage and makes a larger award of property and alimony proper than would be approved in the usual case. Defendant has the ability to pay an award of this size. Hearings before members of this court while this appeal was pending revealed defendant purchased expensive luxury items for himself when it was necessary to obtain a court order to compel him to pay medical expenses for his children.

Defendant also complains of the difficulties occasioned by the lien placed by the trial court against the laundry. Undoubt-edly it will complicate his efforts to finance his business, but the requirement does not seem unreasonable in view of his frequent threats to destroy the building and business. The trial court might well consider an application to furnish some other security if made by defendant.

All portions of the decree not mentioned herein and specifically modified are affirmed.

■■■ VI. Plaintiff seeks custody of her son whose custody was granted to defendant. He was almost 15 years old at the time of trial and testified he wanted to live with his father. He had become most difficult to control, had psychiatric problems and was engaging in delinquent behavior. On at least one occasion he struck his mother. We do not believe she can control him and feel his presence in her home would be most detrimental to the three girls with whom he was unable to get along. Although the father was awarded custody we were told in oral argument Tony was in a private juvenile home at that time.

■■■ VII. Defendant's obstinate refusal to comply with the orders of the trial court and this court have caused both attorneys much additional work and many hearings before this court and the trial court. The trial court allowed plaintiff's attorney a fee of $2000. In view of the work involved since the attorney's fees allowed by the trial court, we grant plaintiff an additional $2000 from defendant toward her attorney's fees.

There is no hope this marriage can be saved. The bitter court fight and charges

I. Although the writer is in sympathy with the result reached here, he is unable to avoid the conclusion that we are ignoring the doctrine of res judicata applicable to divorce actions. Gerk v. Gerk, Iowa, 158 N.W.2d 656, 659; Graves v. Graves, 132 Iowa 199, 207, 109 N.W. 707, 710, 10 L.R.A.,N.S., 216. In this footnote the writer does not speak for the majority. The parties property rights existing at the time of the first decree were determined therein. The facts and circumstances since the first decree do not jus-tify an award of property and alimony so much larger than that granted plaintiff by the first decree. In my opinion, the facts preceding the first divorce are influencing this judgment in spite of statements to the contrary. Reasons stated for approving a larger award than usual for a marriage of such short duration applied with at least equal force at the time of the first decree. We should not make bad law to relieve plaintiff from the effect of her own mistake.

**832**

and countercharges have created wounds that cannot be healed. Even if the evidence were less convincing than we believe it to be, we would hesitate to leave the parties to "stew in their own juice" as suggested by defendant.

The relationship between these parties has, in our opinion, contributed greatly to the emotionally disturbed condition of their oldest child. The three girls should not be subjected to the same stresses and strains any longer. Although a single parent household is far from satisfactory, a severance of this marriage relationship offers these girls the best opportunity for a normal childhood.

The case is affirmed as modified by the change in the alimony provision and remanded to the district court for entry of judgment in accordance herewith.

While this appeal has been pending we were called upon to order defendant to make certain payments. If he has not done so, we also require him to comply with our orders previously made.

Modified, affirmed and remanded for entry of judgment.

All Justices concur except MASON, J., who takes no part.