683 F.2d 1201
 11 Fed. R. Evid. Serv. 542
 SEDCO INTERNATIONAL, S. A., Appellant,
v.
William F. CORY and Marcella McKillip, Executors of the
Estate of Roy J. Carver, deceased, Appellees,
v.
SEDCO INTERNATIONAL, S. A., Sedco, Inc., and Sedco Energy
Corporation (formerly TerraMar Consultants, Inc.),
Appellants.
SEDCO INTERNATIONAL, S. A., Appellee,
v.
William F. CORY and Marcella McKillip, Executors of the
Estate of Roy J. Carver, deceased, Appellants,
v.
SEDCO INTERNATIONAL, S. A., Sedco, Inc., and Sedco Energy
Corporation (formerly TerraMar Consultants, Inc.),
Appellees.
 Nos. 81-2007, 81-2056.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 11, 1982.
Decided Aug. 2, 1982.
 
 D. G. Ribble, Lynch, Dallas, Smith & Harman, D. M. Elderkin, David A. Elderkin, Elderkin, Pirnie, Von Lackum & Elderkin, Cedar Rapids, Iowa, for Cory and McKillip.
 Ralph D. Sauer, Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, Iowa, John H. McElhaney, Stanley E. Neely, Orrin L. Harrison, III, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for Sedco Intern., S. A., Sedco, Inc., and Sedco Energy Corp.
 Before LAY, Chief Judge, and STEPHENSON* and McMILLIAN, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 Sedco International appeals from a finding of liability and an award of money damages to the executors of the estate of Roy Carver[1] (Carver) arising out of alleged fraudulent misrepresentations Sedco officials[2] made to Carver which allegedly induced him to enter into a venture to produce oil in an area located in the Persian Gulf off the eastern shores of the state of Qatar. The representations concerned three abandoned offshore oil wells which Sedco represented could be reentered and made to produce salable oil in less than three months for a total front-end investment of.$2.5 million, with subsequent quick return of the investment and eventual enormous profits. In July 1975 Amos Carter, vice-president of Sedco for mideast drilling operations, represented to Carver that it would be possible to uncap the three wells, run pipe into them, and pump the oil directly into a tanker or barge. He explained that the previous driller, a consortium of Japanese companies, had abandoned the wells because "they (were (unnecessarily)) going to run a pipe line out to these wells," creating tremendous expense which, given the lower price of oil at that time, made the concession appear less attractive. On the basis of these representations Carver and his ostensible partner, R. Eugene Holley, a former lawyer and Georgia state senator, formed Holcar, a corporation, in order to seek the concession from the government of Qatar. Carver agreed to finance the front-end costs of the project through personal loans to Holcar. The concession was secured and Holcar hired Sedco to do much of the planning, reentry, and workover. Work began on the project in January 1976. None of the wells was successfully restored. Carver was never told the true state of the well site operations; instead Sedco representatives told him that the wells had been successfully reentered and completed. An even greater problem, however, was the "discovery" of H 2S (hydrogen sulfide) and the revelation that oil could not be pumped directly into a tanker or barge. Sedco knew that the H 2S problem had caused earlier failure and abandonment of the wells, but did not reveal this fact to Carver. After more than a year and after more than $13 million was expended, work ceased without production of any oil. In 1978 the government of Qatar terminated the concession.
 
 
 2
 In December 1977 Sedco brought suit against Carver and Holcar in the Northern District of Iowa seeking final payment for use of its equipment and services. Carver counterclaimed for his damage, alleging fraudulent misrepresentation. Holcar was dismissed from the action. After a five week trial the district court, the Honorable William C. Hanson presiding, after making detailed factual findings, denied Sedco's claim, ruled that Carver had been fraudulently induced to rely on Sedco's misrepresentations, and entered a judgment in favor of Carver for $13,206,081.25 plus interest. Sedco International, S. A. v. Cory, 522 F.Supp. 254, 332 (S.D.Iowa 1981).
 
 
 3
 On appeal Sedco does not dispute the sufficiency of the evidence supporting the finding of fraud but urges the district court erred (1) in sustaining Carver's claim of attorney-client privilege and thereby precluding examination concerning advice Carver's personal attorneys may have given him, (2) in its analysis of the proximate cause element of Carver's claim, (3) in computing damages, and (4) in refusing to dismiss Carver's claim because he made an illegal payment at the start of the enterprise. Carver cross-appeals contending the district court erred in excluding an allegedly illegal $1.5 million payment from the damage award. The estate also argues that it is entitled to "precommencement" interest.
 
 
 4
 We affirm the judgment of the district court.
 
 
 5
 Attorney-Client Privilege.
 
 
 6
 Sedco claims the district court erred when it refused to allow Sedco to examine Carver concerning advice he may have received from his attorneys. Sedco alleges the attorneys' statements are not privileged. Sedco alternatively argues that application of the attorney-client privilege was inappropriate in this case because it served to prevent Sedco from discovering whether Carver actually relied on Sedco employees' statements and, if he did, whether Carver's reliance was justifiable. Sedco claims that by claiming fraud, Carver waived any right to object to examination which might elicit facts relevant to his state of mind. In a pretrial affidavit, Carver disclosed all factual information and business advice which his lawyers acquired from other sources and conveyed to him during the time he claims to have relied on Sedco employees' statements. Sedco claims, however, that all conversations between Carver and his attorneys should have been disclosed.
 
 
 7
 The record reveals a belated attempt by Sedco to make an issue of the attorney-client conversations. Carver's counterclaim was filed in July 1978. After exchange of voluminous interrogatories and the taking of many depositions, the issue first arose during the taking of Carver's deposition on March 25, 1980. He was asked about attorney David Elderkin's negative feelings about the project. Carver objected based on the attorney-client privilege. Thereafter the matter was dropped and Sedco did not make a motion to compel. Sedco pursued further discovery and on July 9, 1980, took a second deposition from Carver consisting of 165 pages. No question was proffered concerning Carver's receipt of advice from his attorneys.
 
 
 8
 On July 28 Sedco filed a motion and on August 15 a "supplemental brief" requesting an order compelling "Carver to produce all documents and to answer deposition questions concerning communications to and from his attorneys pertaining to (a) business advice, (b) facts and (c) opinions concerning business and legal risks." The brief contained the waiver argument. However, the central argument in the motion, based on Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), was that the attorney-client privilege does not protect information which an attorney gathers from independent sources and communicates to his or her client. The motion and brief did not request any specific ruling or refer to any specific questions. In response to this motion, the trial court ordered Carver to disclose any factual information and any business advice which his attorneys received from independent sources and communicated to him. Carver thereafter filed an affidavit stating that his attorneys received and conveyed no information from independent sources until July 1976 when Elderkin acquired a report from Miller & Lents, an oil and gas consulting firm.[3] The report was made available to Sedco (and was later introduced as evidence).
 
 
 9
 At trial, Carver was extensively cross-examined about the entire transaction. There were only two references to Carver's attorneys. One question concerned a January 12, 1976, letter from attorney Elderkin which discussed legal aspects of the Sedco-Holcar contract. Carver was also asked whether he had received any information from attorneys other than that disclosed in his affidavits. Carver answered in the negative.
 
 
 10
 Finally, during the last hour of the five week trial, Carver was placed on the stand as Sedco's witness and was asked approximately 50 questions, investigating, for the first time in the trial itself, what legal and nonlegal advice Carver received from his attorneys on virtually every aspect of the series of events. Sedco's attorney repeatedly asked Carver whether his attorneys had given him any legal advice on a particular subject, any business advice, or any factual information. Carver answered many of these questions. However, Carver's attorney objected to many of the questions on grounds of attorney-client privilege, the composite and overbroad form of the questions, and irrelevance. The court sustained many of the objections on all three grounds.[4]
 
 
 11
 No contention can be made that the attorney-client privilege precludes disclosure of factual information. The privilege does not protect facts communicated to an attorney. Upjohn Co. v. United States, 449 U.S. 383, 395-96, 101 S.Ct. 677, 685-86, 66 L.Ed.2d 584 (1981). Clients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources. Hickman v. Taylor, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947); 8 J. Wigmore, Wigmore on Evidence § 2317 (McNaughton rev. 1961). However, Carver, in his affidavit, stated that the only facts which his attorneys received from other sources and conveyed to him were those contained in the Miller & Lents report. These facts were disclosed. Thus, Sedco's belated examination of Carver concerning factual information was redundant; in other words "asked" and "answered."
 
 
 12
 The questions relating to legal and business advice require separate analysis. Legal advice is clearly privileged to some degree. Compare 8 J. Wigmore, Wigmore on Evidence § 2320 (McNaughton ed. 1961) and Fed.R.Evid. 503 advisory committee note (full privilege) with In re Fischel, 557 F.2d 209, 211 (9th Cir. 1977) and United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358-59 (D.Mass.1956) (privileged to extent necessary to prevent disclosure of client's confidential communication). Sedco urges, however, that the attorney-client privilege does not protect ordinary business advice. Although this is true, legal advice concerning commercial transactions is often intimately intertwined with and difficult to distinguish from business advice. Cf. 8 J. Wigmore, Wigmore on Evidence § 2296 (McNaughton rev. 1961) (difficult to determine whether client's communication for purpose of obtaining legal advice or for other purposes), quoted in Diversified Industries Inc. v. Meredith, 572 F.2d 596, 610 (8th Cir. 1977) (en banc). In the present case, evidence indicates the advice given Carver by his counsel was primarily legal advice and that disclosure might reveal Carver's confidential communications. We therefore turn to the question of waiver and a discussion of relevance.
 
 
 13
 Sedco urges that by interposing a claim of fraud, Carver placed his state of mind in issue and thereby waived his right to assert the attorney-client privilege. A client may waive the protection of the attorney-client privilege either expressly or by implication. United States v. Cote, 456 F.2d 142, 144 (8th Cir. 1972) (citing 8 J. Wigmore, Wigmore on Evidence § 2327 (McNaughton rev. 1961)). Sedco does not contend that Carver expressly waived his right. In determining whether there has been an implied waiver, two elements must be examined: (1) implied intention and (2) fairness and consistency. Courts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, see, e.g., Kantaris v. Kantaris, 169 N.W.2d 824 (Iowa 1969), when a client places the attorney-client relationship directly at issue, see, e.g., Tasby v. United States, 504 F.2d 332, 336 (8th Cir. 1974), cert. denied, 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975) (client charged attorney incompetence), and when a client asserts reliance on an attorney's advice as an element of a claim or defense, see, e.g., Hearn v. Rhay, 68 F.R.D. 574 (E.D.Wash.1975) (advice of attorney element of good faith defense in civil rights action). Dean Wigmore has said that "(a) waiver is to be predicated ... when the conduct ... places the claimant in such a position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege." 8 J. Wigmore, Evidence § 2388, at 855 (McNaughton rev. 1961).
 
 
 14
 Sedco argues that the failure to disclose the content of the attorneys' advice may have prevented Sedco from proving that Carver did not rely on Sedco personnel's misrepresentations or that such reliance was not reasonable. We conclude that by asserting fraud, Carver, at most, waived his right to assert the privilege to prevent disclosure of communications which might have proven he did not rely on Sedco employees' statements or that such reliance was unreasonable.
 
 
 15
 Reliance exists if substantial weight was given to a representation. W. Prosser, Law of Torts § 108, at 715 (4th ed. 1971). The representation does not have to be the sole cause of damage; it is enough if it had a material influence upon plaintiff's conduct or was a substantial factor in bringing about his or her action.
 
 
 16
 Carver presented persuasive evidence that he acted in reliance on Sedco employees' statements. Carver's attorneys' statements are relevant to this issue only if they might demonstrate that Carver acted as he did for reasons unrelated to the Sedco misrepresentations. Carver testified that prior to entering into the concession agreement he received advice only from Sedco officials and Secondary Recovery Services. He does admit that his office received letters in late 1975 and early 1976 from attorney Elderkin with regard to the legal aspects of the Sedco-Holcar drilling contract. There is also evidence that Carver discussed the concession with Elderkin before 1976. Still, before Carver read a report of May 27, 1976, prepared by consulting engineers Earl and Wright, a wholly owned subsidiary of Sedco, which made it apparent that the earlier representations made by Sedco were not accurate,[5] all technical information came from Sedco.
 
 
 17
 After Carver received this evidence that the original representations were incorrect, Sedco employees continued to make representations which induced his continued reliance. Robert Smith, then president of Sedco's TerraMar Consultants, represented to Carver that the wells were successfully reentered, completed, and capable of producing oil at a profitable rate. Carter represented to Carver that "there was no way in hell that you could lose" on this project (while warning others that Carver should not be told the total cost of the project because "(i)t may scare the old man off"). Carver continued until 1976 to make investment decisions on the basis of these misrepresentations. Sedco fails to suggest and we cannot imagine what Carver's attorneys could have told him, without first acquiring factual information from other sources, which might demonstrate that Carver acted for reasons unrelated to Sedco employees' representations.
 
 
 18
 Sedco also suggests that the attorneys' statements might reveal that Carver's reliance was unreasonable. This reasonableness standard is a subjective standard which is not concerned with what a reasonable person would do, but rather with what "the complaining party reasonably could be expected to do." The test for determining whether one party to a transaction has a right to rely on the other party's representations is "whether the complaining party, in view of his own information and intelligence, had a right to rely on the representations." Lockard v. Carson, 287 N.W.2d 871, 878 (Iowa 1980).
 
 
 19
 Sedco argues that all advice given Carver by his attorneys was part of his "intelligence and information" and that the court could not judge the reasonableness of Carver's reliance without knowing what the attorneys told Carver. The problem with Sedco's argument is that only certain types of information could have made Carver's reliance unreasonable. Sedco does not suggest and we cannot perceive how receipt of ordinary legal advice could have made reliance unreasonable. Only evidence that Carver received new factual information or technically expert analysis of known facts might have revealed that reliance was unreasonable. However, Carver's affidavit disclosed the only bit of factual data or business advice which his attorneys procured from other sources and conveyed to him during the period of alleged reliance. It is difficult to perceive that counsel's own opinions on strictly commercial subjects, if any were expressed to Carver, could have made Carver's reliance on Sedco unreasonable. Sedco failed to lay any predicate by showing that Elderkin or any of Carver's lawyers possessed any special knowledge about or expertise in the area of oil drilling.
 
 
 20
 District courts possess broad discretion in making evidentiary rulings. This court will not disturb such rulings absent showings of abuse of discretion and resulting prejudice. Yost v. A. O. Smith Corp., 562 F.2d 592, 595 (8th Cir. 1977). Sedco has failed to make either of these showings in relation to the attorney-client communications.
 
 
 21
 We find the rulings of the district court were not erroneous.
 
 
 22
 Proximate Cause.
 
 
 23
 Carver sought only to recover for the loss of the loans he made to Holcar. Sedco urges, however, that Carver himself proximately caused the loss of the loans.
 
 
 24
 There is no dispute that by misrepresenting the true state of the concession, Sedco induced Carver to make the loans. There is also no dispute that after May 27, 1976, when he received the second Earl & Wright report, Carver knew that the original representations as to time, cost, and manner of production were incorrect, and that he nevertheless continued to make loans. The trial court found that the misrepresentations of Carter and Smith were proximate or legal causes of Holcar's failure to complete the project and of the losses actually suffered. Cory, 522 F.Supp. at 329.
 
 
 25
 The district court examined each element of Carver's alternative claims of fraudulent and negligent misrepresentation.[6] It concluded that Carver had proved every element of each claim "by the overwhelming weight of the clear, satisfactory, and convincing evidence presented at the trial of the case." Id.
 
 
 26
 The district court found that Carver could justifiably rely on the original misrepresentations as to time, manner, and cost of production until May 27, 1976, when he learned they were not correct. His decision to continue with the venture after that date raises the question of minimizing damages under the avoidable consequences rule. D. Dobbs, Remedies § 3.7 (1973). On May 27, 1976, Carver had expended between.$2.5 and $7 million. He then decided to continue the project with the goal of bringing it to fruition in order to recoup some or all of the money he had spent. Carver is entitled to recover for expenditures reasonably made in his effort to do so, even though his additional expenditures did not succeed in their goal, provided they were reasonably expended at the time. Id.
 
 
 27
 The district court found that by May 27 Carver had already made enough of a commitment to the project that he did not have to abandon it. The court found Carver had no reason not to rely on Sedco's reserve and production rate estimates which indicated that a substantial profit could still be made even at the cost projected by Carter. Although he knew that Sedco representatives had been wrong as to their original statements concerning time, cost, and manner of production, Carver had no reason to suspect more than an honest mistake; at that time he had little reason to suspect that he was being intentionally defrauded.
 
 
 28
 The district court found that once Carver decided to continue the project, his manner of operation was not unreasonable. The evidence shows he proceeded with greater caution. Carver ceased operations after 1976. The district court found Carver's decision to halt operations was reasonable in light of the unfavorable engineering reports and the difficulty he was experiencing obtaining reasonable financing. On the basis of the overall record, these findings are not clearly erroneous.
 
 
 29
 Cessation of the Agreement.
 
 
 30
 It was necessary for Carver to show that Sedco's actions were a proximate cause of the nonpayment of the loans. Sedco argues that Carver caused his own losses by failing to comply with his agreement with the government of Qatar. Sedco contends that Carver was responsible for Holcar's failure to fulfill the reporting requirements of the agreement and that this failure caused Qatar to revoke Holcar's rights to any oil. Sedco further urges that Carver caused his own losses by continuing to make loans after May 1976, failing to make enough additional loans in 1977 to produce oil from the concession, and failing to sell all or any part of the concession rights.
 
 
 31
 We find that, under the test set forth by Restatement (Second) of Torts § 546 (1977), there was sufficient evidence supporting the district court's finding of causation in fact.[7] The district court found that Carver justifiably relied on the misrepresentations of Carter and Smith; that these misrepresentations did in fact induce him to enter into the transaction; and that his reliance was "a substantial factor in determining the course of conduct that result(ed) in his loss." Cory, 522 F.Supp. at 328.
 
 
 32
 Sedco argues that Carver's acts or omissions were of much greater magnitude and that they overshadow the slight connection between the tortious inducement and the loss of loans. The trial court found:
 
 
 33
 In particular, Sedco cites Carver's failure to comply with his written commitment to the government to provide certain information by July. Sedco claims that "Carver purposely caused this default by overruling Bob Smith's offer to coordinate the considerable efforts needed to comply." But by this time Carver was well aware of the misrepresentations that had filled previous Smith reports. It must have been clear to Carver, as it is to this Court, that Smith would have prepared any type of report necessary, regardless of the truth, in order to perpetuate his business with Holcar. No doubt Holcar's failure to submit this report further damaged relations with the government, but the Court rejects Sedco's contention that the concession would have been saved or lost on the basis of whether Holcar had adequately fulfilled its reporting requirements. It was the failure to perform the work obligations that concerned the government, and the blame for this failure lies with Sedco. The reports were important principally because they were to inform the government of Holcar's progress in satisfying its work obligations. The Court finds that Holcar's breach of the reporting requirements was simply another result of the initial and continuing fraud that was perpetrated on Carver and that caused Holcar's failure to fulfill its work obligations. The disarray into which the project fell and the consequent lapses in communication with the government were caused by the disparity between the venture as it was misrepresented by Sedco through Amos and Smith and as it existed in fact.
 
 
 34
 Cory, 522 F.Supp. at 309.
 
 
 35
 After examining the evidence the district court was unable to find that had the project been completed, Carver would have regained his investment. The court also found that Carver was still justified in not investing any more money in the project after January 1977 even if he could have recovered his investment. Judge Hanson stated:
 
 
 36
 The project was already far out of the bounds he envisaged when he undertook it; he was carrying Holley and his banks along on a free ride; money was proving difficult to come by on acceptable terms; and even if he might have gotten all his money back had he gone all the way, he was advised that chances were not that good, it would in any event have taken considerable time, and the return on the investment would certainly have been unreasonably low, particularly since Holley would take half Holcar's profits. A person is not required to go on forever in the face of hopeless odds with his attempts to mitigate his damages; indeed, he may not. The Court is of the opinion that Carver could have stopped entirely in January 1977 and successfully sued Sedco then for recovery of his losses.
 
 
 37
 Cory, 522 F.Supp. at 328 (footnotes omitted).
 
 
 38
 The trial court found the misrepresentations of Sedco officials were legal causes of the losses. Carter and Smith induced Carver into making a "hasty and ill-prepared entry on a project whose real magnitude was far greater than he knew and whose chances of success far less," on terms with Holley that he never would have accepted had he been fully informed. The district court found Carter and Smith reasonably could and should have expected: the disarray into which the project fell; the acrimony that developed between Carver and Holley; Carver's decision to get out when he learned of the fraud; and the government's decision to terminate the production-sharing agreement after Holcar demonstrated its "misrepresentation-induced incompetence." Cory, 522 F.Supp. at 328. Thus, since Carver's losses could reasonably have been expected to result from his reliance on the misrepresentations, there was legal causation. Restatement (Second) of Torts § 548A (1977).[8]
 
 
 39
 Sedco argues that Carver might have been able to prevent the loss of both the concession and his loans by selling all or part of the concession. The district court found that Carver made a "good faith" effort to secure another partner and to obtain approval for the new partnership from the Qatar government. The evidence supports the finding that Holcar's failure to perform work obligations undoubtedly did create animosity toward Holcar which prevented Holcar from continuing to work the concession alone or with a partner. This fact, however, does not detract from the district court's finding that the acts of Sedco personnel proximately caused Carver's injury.
 
 
 40
 The Illegal Payment.
 
 
 41
 In December 1975, Ali Jaidah, director of Qatar's Department of Petroleum Affairs, told Carver that unless he paid $1.5 million to the Swiss bank account of Kassem Jaidah (Ali's brother and business partner of Amos Carter), the Qatar government would not grant the concession to Holcar. Carver protested; but after conferring with Holley and Carter, he made the payment.
 
 
 42
 The trial court found that Carver, an experienced international businessman, should have known that the payment was improper. The court also concluded that such payments are contrary to the public policy of this nation and are illegal actions. See Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-2 (1976 Supp. I), which codifies this policy and S.Rep.No.114, 95th Cong., 1st Sess. 3, reprinted in 1977 U.S.Code Cong. & Ad.News 4098, 4101, 4107. Thus, the district court found Sedco is not liable to Carver for the money he paid to Jaidah. On the strength of the district court's reasoning we must agree.
 
 
 43
 Sedco urges that Carver's illegal act should bar the recovery of the loans made to Holcar. Generally, one who engages in a fraudulent scheme forfeits all right to protection, either at law or equity. Kansas City Operating Corp. v. Durwood, 278 F.2d 354, 357 (8th Cir. 1960). This rule is not applied mechanically, however, and in every case we must determine whether the goals of the law will be furthered or defeated by granting the relief asked. See 6A A. Corbin, Corbin on Contracts § 1534 (1962).
 
 
 44
 There is no doubt that Carver cannot recover his payment to Jaidah, for even though he may have been wronged the law will not aid the plaintiff where his claim for recovery is based upon an illegal act. Durwood, 278 F.2d at 358. To rule that the payment bars all recovery, however, would allow Sedco to escape punishment for its evil. Through misrepresentation, Sedco created in Carver the belief that the Qatar concession was a valuable right. Carver further believed that he had to make a questionable payment to Jaidah in order to secure that right. He was encouraged in this belief by Amos Carter, who a year later tried to cover up the true nature of the payment. Cory, 522 F.Supp. at 289 n.39. The trial court found that Sedco's complicity in the improper payment was at least as great as Carver's.
 
 
 45
 The record is clear that the payment was Carver's one illegal act in this whole series of affairs. Sedco, on the other hand, carried on with a string of misrepresentations and brazen deceit. We agree with the trial court that Carver was comparatively less culpable than Sedco, for Carver made the illegal payment partly as a result of Sedco's fraud, and Sedco repeatedly defrauded Carver through several years of the project's life. As the trial court found "(t)o bar all recovery by Carver would punish him out of all proportion to the magnitude of his offense while permitting Sedco to reap the benefits of its own more pervasive wrongdoing." Cory, 522 F.Supp. at 322. We agree with the district court that the ends of justice will be better served by adjusting the rights of the parties so that Carver cannot recover the bribe but may recover the loans made to Holcar.
 
 
 46
 Damages.
 
 
 47
 Sedco urges that Carver failed to meet the burden of proving the amount of damages with reasonable certainty. Some of Carver's claimed expenses are documented only by cancelled checks and check stubs, and not by invoices. Sedco urges that this documentation does not support the court's finding that these payments were actually made on behalf of Holcar, and, even if they were, whether they were reasonable and necessary. Moreover, Sedco contends that the district court erred by allowing Carver to introduce at trial summaries of these claimed expenses.
 
 
 48
 The district court found that the record provided a reasonable and sufficient basis for determining Carver's Holcar-related expenditures. The court found that the vast bulk of the payments were made to companies or individuals that supplied goods or services clearly used during the reentry and workover of the wells or intended for use in connection with the installation of production facilities. Another group of payments was made to consultants or agents. The court carefully segregated payments made to firms with an ambiguous connection to the project and disallowed those that did not indicate a relation to Holcar.
 
 
 49
 Carver was required to establish his claim "with some reasonable measure of certainty and to show facts affording a reasonable basis for ascertaining the loss." Conrad v. Dorweiler, 189 N.W.2d 537, 540 (Iowa 1971); see D. Dobbs, supra, p. 13, at § 3.3. The court is allowed considerable leeway in arriving at the amount of damages once the fact of damages is established. Clements Auto Co. v. Service Bureau Corp., 444 F.2d 169, 190 (8th Cir. 1971).
 
 
 50
 We are convinced that the trial court could correctly find business purpose and reasonable charges from the record, cancelled checks, and check stubs for drilling, exploration, production, consulting, and agent expenses. The set of "questionable payments" which was found proved because "Holcar" was written on the check or stub presents a more difficult question. Given the number of claimed expenses that Judge Hanson disallowed, however, we are convinced that the court's method of allowing expenses, while imperfect, was based on "facts affording a reasonable basis for ascertaining the loss." We find the court determined damages in a reasonable manner.
 
 
 51
 Sedco urges that without invoices, no sufficient foundation existed for the introduction of the summaries of the claimed expenses. See Fed.R.Evid. 1006. The court overruled Sedco's objection to the summaries at trial because it viewed the exhibits merely as summaries of the actual transactions amply evidenced for the most part by other documents made available for Sedco's examination and received in evidence without objection. Moreover, the court relied on this list of claimed expenses only for the mathematical total of the alleged payments. Cory, 522 F.Supp. at 311. Thus, the court did not rely on this list as proof of the expense, but relied only on the computer's ability to total the claims. The court examined each individual claim separately and disallowed those claims not sufficiently documented. It then subtracted the disallowed claims from the total to arrive at the same amount it would have reached if it had added together all of the claimed expenses that were allowed. Since the court separately examined each claim and did not rely on the summary as proof of any claim, we do not find the use of the summaries to constitute reversible error.
 
 
 52
 Interest.
 
 
 53
 Carver was awarded ten per cent interest from the day he filed his counterclaim, July 21, 1978, on the total of the sums he had expended by that date. He was also awarded interest at the same rate on those additional sums he expended after July 21, 1978, from the various dates such payments were made. The court refused to award interest for any period of time before July 21, 1978. Carver appeals this denial of "precommencement" interest.
 
 
 54
 Iowa law governs the amount of interest due on the judgment. N-Ren Corp. v. American Home Assurance Co., 619 F.2d 784, 789 (8th Cir. 1980). It is the general rule in Iowa that interest runs from the time money becomes due and payable, and in the case of unliquidated claims, this is the date they become liquidated, ordinarily the date of judgment. Mrowka v. Crouse Cartage Co., 296 N.W.2d 782, 783 (Iowa 1980). One exception to this rule is recognized "in cases in which the entire damage for which recovery is demanded was complete at a definite time before the action was begun." Bridenstine v. Iowa City Electric Railway, 181 Iowa 1124, 1136, 165 N.W. 435, 439 (1917).
 
 
 55
 Although Carver urges otherwise, the Iowa Supreme Court stated that "the rule has long been to allow interest from the time the entire damage is complete." Mrowka, 296 N.W.2d at 783 and Vorthman v. Keith E. Meyers Enterprises, 296 N.W.2d 772, 779 (Iowa 1980) (decided the same day as Mrowka ) (both quoting Bridenstine, 181 Iowa at 1136, 165 N.W. at 439).
 
 
 56
 The district court held that Carver's damages were neither liquidated nor complete at the time Sedco filed its claim against Carver. The court also determined that the Iowa Supreme Court would not interpret the new Iowa statute granting interest from the day the counterclaim is filed to allow precommencement interest in this case. Cory, 522 F.Supp. at 331.
 
 
 57
 In light of the deference to be given the trial court's interpretation of Iowa law, we are not persuaded that the trial court was clearly in error in finding that the entire damage was not complete until after July 21, 1978. Thus, the trial court did not err in denying precommencement interest.
 
 
 58
 Conclusion.
 
 
 59
 Although there existed conflicting evidence regarding the factual questions relating to reliance and causation of damages, the record contains sufficient evidence to support the trial court's findings; Sedco has failed to demonstrate that Judge Hanson's findings were clearly erroneous. For the reasons set forth in this opinion we affirm the decision of the district court.
 
 
 
 *
 The Honorable Roy L. Stephenson assumed senior status effective April 1, 1982
 
 
 [1]
 Roy Carver died after the case was fully submitted for decision to the district court. Carver's executors were substituted as parties to the action
 
 
 [2]
 Sedco International and Sedco Energy, formerly known as TerraMar, are subsidiaries of Sedco Incorporated. These corporations will sometimes be referred to collectively as "Sedco."
 
 
 [3]
 Walter Crow, a Miller & Lents engineer, produced the report with information furnished by TerraMar, a Sedco subsidiary
 
 
 [4]
 After sustaining one such objection, the judge stated that he considered the questions "improper." He noted that the questions "refer to matters which have already been tried over and over again in this case." Finally, the judge told Sedco's counsel, "When you say 'all the facts', no one can remember all of the facts.... (I)t would be an impossibility to give a true and correct answer to this type of interrogatory; and, for that reason, the Court further sustains (the objection) based on and predicated upon the form of the interrogatory."
 
 
 [5]
 On February 25, 1976, Carver received an earlier report from Earl and Wright that disclosed for the first time the H 2S problem and presented a more accurate estimate of the cost of the project. The district court found that by the time Earl and Wright presented their report, Amos Carter had discredited it, minimized the H 2S problem it made so much of, and convinced Carver that the sale of oil could begin much sooner and would require a much smaller investment than Earl and Wright projected. As the district court found "(t)he misrepresentations underlying Carver's participation in the venture were successfully concealed, and their force and effects continued unabated." Cory, 522 F.Supp. at 294
 
 
 [6]
 The trial court found that the plaintiff in an action for fraud has the burden to prove each of the following elements: (1) a material misrepresentation (2) made knowingly (scienter) (3) with intent to induce the plaintiff to act or refrain from acting (4) upon which the plaintiff justifiably relies (5) with resulting injury and damages. Beeck v. Kapalis, 302 N.W.2d 90, 94 (Iowa 1981)
 The trial court found the law of negligent misrepresentation to be:
 (1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 Restatement (Second) of Torts § 552.
 See Larsen v. United Federal Savings & Loan Ass'n, 300 N.W.2d 281, 287 (Iowa 1981).
 
 
 [7]
 Section 546 states:
 The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss.
 Restatement (Second) of Torts § 546 (1977).
 
 
 [8]
 Section 548A states:
 A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.
 Restatement (Second) of Torts § 548A (1977).