**In re: IBP CONFIDENTIAL BUSINESS DOCUMENTS LITIGATION.**

**Hughes A. BAGLEY, Appellee,**

**v.**

**IOWA BEEF PROCESSORS, INC., Appellant.**

**No. 83–1894.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1984.

Decided Feb. 13, 1985.

Fagg, Circuit Judge, dissented with opinion.

See also, 491 F.Supp. 1359.

Don H. Reuben, Chicago, Ill., argued, Edward M. Blando, Cedar Rapids, Iowa and Thomas E. Deacy, Jr., Kansas City, Mo., for appellant.

Robert D. Sack, New York City, for amicus curiae.

William J. Rawlings and Michael P. Jacobs, Sioux City, Iowa, for appellee.

Before BRIGHT, ARNOLD and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

Hughes A. Bagley brought this action [1] against Iowa Beef Processors, Inc. (IBP), claiming damages for libel, invasion of privacy, and tortious interference with employment,[2] all resulting from a letter written by IBP to a congressional subcommittee in which IBP in essence called Bagley a liar and a thief. Federal jurisdiction rests on diversity of citizenship. After twelve days of trial, the jury found IBP liable on all three claims and awarded Bagley compensatory and punitive damages of $8.75 million.[3] The district court entered final judgment, as modified after post-trial mo-

---

1. Before the Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa.

2. In addition, Bagley claimed that a suit IBP filed against him in 1977 constituted an abuse of process. The district court ruled that the applicable statute of limitations barred this claim. This ruling is not in issue on appeal.

3. The jury returned a verdict as follows:

| CLAIM | COMPENSATORY DAMAGES | PUNITIVE DAMAGES |
| --- | --- | --- |
| Libel | $1,000,000 | $5,000,000 |
| Invasion of Privacy | 250,000 | 1,500,000 |
| Tortious Interference with Employment | 150,000 | 500,000 |
| Tortious Interference with Prospective Advantage | 100,000 | 250,000 |
| | $1,500,000 | $7,250,000 |

tions,[4] for $9.33 million. IBP appeals. We affirm the award for tortious interference with existing employment and reverse the awards for libel and tortious interference with future employment.

In submitting Bagley's claim of libel to the jury, the district court instructed the jurors that to recover damages Bagley must prove by a preponderance of the evidence:

1. That [IBP] published a letter concerning [Bagley] which was a libel as that term is defined in these instructions.

2. That [IBP] published the letter with knowledge that it was false.

3. That the libel was read by members of the general public.

4. That as a proximate result of [IBP's] actions, [Bagley] sustained damages.

The district court further instructed the jury that the allegedly defamatory statements in IBP's letter to the congressional subcommittee were libelous per se, creating "a legal presumption of their falsity thus shifting to [IBP] the burden of proving the truth of the statements" and "a presumption of injury and damage even if actual pecuniary damages cannot be proved." As to damages, the district court explained that establishing the elements of his libel claim entitled Bagley to compensatory damages and that, if the jury found that IBP had acted with "actual malice" (with knowledge that the statements were false or with reckless disregard of whether they were

false or not), they could award Bagley punitive damages as well.

In its post-trial motion for judgment notwithstanding the verdict or alternatively for a new trial, IBP argued that the district court erred in so instructing the jury, and entered judgment on the libel claims in derogation of IBP's first amendment rights. IBP contended, among other things,[5] that the allegedly libelous letter and the subsequent republications thereof were privileged, urging the applicability of the following: 1) the absolute privilege at common law afforded statements made in the course of a legislative proceeding, 2) the *Noerr-Pennington* doctrine (*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)), which protects bona fide attempts to petition the government, 3) the right, at common law, to reply in an appropriate manner to public accusations, and 4) the "actual malice" standard of liability, rather than presumptive liability, based on Bagley's alleged status as a limited public figure. IBP also contended that the district court unconstitutionally imposed liability without fault by instructing the jury to presume falsity. In addition, IBP argued that the damage awards, having no relationship to injury actually suffered, were constitutionally impermissible.

The district court rejected these arguments [6] and therefore denied IBP's motion

---

**4.** The district court vacated Bagley's $1.75 million invasion of privacy verdict as a double recovery. Bagley does not appeal this ruling. In addition, the district court granted Bagley's motion for prejudgment interest, awarding him an additional $2.33 million. IBP contests this award of interest.

**5.** IBP's post-trial motion and supporting memorandum listed in excess of fifty propositions without argument, each followed simply by case citations and citations to the record. The district court understandably declined to respond in detail to each point. Instead, it considered in depth only those objections which, in its view, "have merit or those where substantial controversy exists." In summarizing IBP's arguments before the district court, we limit ourselves to those objections specifically addressed by the

district court that IBP raises once again on appeal.

**6.** The district court ruled that IBP's letter did not fall under the protective umbrella of the common law's legislative testimonial privilege because IBP's actions "took place away from the legislative proceeding in a non-testimonial context." The court declined to apply the *Noerr-Pennington* doctrine to Bagley's libel claim, concluding that such an application strayed too far from the context in which the doctrine originated (antitrust) and the contexts to which it is normally confined ("situations otherwise related to practices between competing business entities"). Assuming arguendo that the doctrine did apply, the court nevertheless found that IBP's actions fell within the "sham" exception because

for judgment notwithstanding the verdict or a new trial. IBP raises each of these arguments again on appeal. In addition, IBP contends that the district court denied it a fair trial by allowing the introduction of prejudicial and irrelevant evidence and by permitting improper closing argument. IBP also argues that the tortious interference verdicts must fall because they are hopelessly tainted by the libel portion of the trial.

We agree with IBP's contention that the libel instructions cannot pass constitutional muster. For the reasons discussed at length below, we believe that IBP is immune from liability unless Bagley can prove by clear and convincing evidence that the defamatory statements were false and that they were made with "actual malice."

## I. BACKGROUND.

IBP, a large meatpacker, employed Bagley from mid-1971 to mid-1975, first as a consultant and then as vice president of retail sales development. In July of 1975, Bagley left IBP's employ,[7] taking with him files that he generated while he worked there (the Bagley Documents).[8] IBP and Bagley, both with the benefit of counsel, subsequently negotiated and executed a settlement agreement, releasing each other from potential liability arising out of their employment relationship and the termination thereof. In that agreement, Bagley agreed not to assist any third party in bringing a lawsuit against IBP.[9]

In late 1976 and early 1977, Bagley met with several lawyers who were interested in the potential antitrust ramifications of IBP's activities. Those lawyers were Albert Krieger, a criminal defense attorney, who, with one unrelated exception, had never handled an antitrust case but hoped to do so, based on information he learned from Bagley; Minnesota attorney John Cochrane and Iowa attorney Lex Hawkins, then representing the Meat Price Investigators Association (MPIA) in antitrust litigation against four meatpacking companies, including IBP; and attorneys who had on occasion represented the Greater New York Association of Meat and Poultry Dealers. In the course of these meetings, Bagley disclosed information about IBP's

---

they "were not motivated by a genuine desire to influence legislation, but rather by a desire to cause [Bagley] harm." The court rejected IBP's common law right-to-reply defense because it found that IBP did not respond to Bagley's charges in an appropriate manner. Finally, the court declined to hold that Bagley was a limited public figure because he "did not voluntarily inject himself into the controversy," he did not have regular and continuing access to the media, and he was not the "primary actor" in the controversy.

The court also rejected IBP's argument that the presumptions embodied in the court's instructions to the jury were constitutionally impermissible. The court determined that *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), did not change the law of libel in actions involving a private plaintiff and a non-media defendant. Thus, according to the court, the instructions appropriately embodied Iowa common law.

**7.** Bagley claimed, then and at trial, that he was fired. IBP took the position that Bagley chose to resign.

**8.** The files included materials that he accumulated before, as well as during, his tenure at IBP. Among the documents in the files were IBP's weekly profit and loss statements, monthly reports on production and sales, the president's staff meeting reports, confidential legal memoranda, data concerning customers and their purchasing behavior, and memoranda outlining IBP's goals, marketing strategies, and pricing formulas.

In addition, Bagley later received some documents containing production figures from Charles Overstreet, a former IBP employee, and gained access to documents generated by IBP's formula pricing committee, which Hans Aarsen, another former IBP employee, took when he left IBP's employ (the Aarsen Documents). For purposes of this opinion, any reference to the Bagley Documents includes these documents.

**9.** Clause 3.2 of the settlement agreement provides, in part:

Bagley, for himself and heirs, legal representatives and assigns, covenants with IBP to forever refrain from aiding, abetting or in any way assisting any third person not a party to this agreement in the bringing of any action or the prosecution of any claim or demand of whatever kind or nature against IBP for any matter, fact, circumstance, happening or thing whatsoever occurring or failing to occur from the beginning of the world to the day of the date of these presents.

activities and permitted the attorneys to examine, and in some cases to copy, some of the Bagley Documents. Bagley also met in late 1976 with Irving Stern and Jess Proston, officials of the Meat Cutters Union, who, anticipating upcoming contract negotiations with IBP, discussed with Bagley the advisability of a strike.

IBP learned of Bagley's activities in the spring of 1977 and, on June 7, 1977, filed suit in federal district court against Bagley and others, seeking injunctive relief and damages. In its complaint, IBP alleged that Bagley breached his fiduciary duty to IBP and violated the express terms of his termination agreement.[10] IBP dismissed its claim against Bagley for damages in June of 1982, but continued to seek injunctive relief compelling Bagley to return the Bagley Documents and to honor his contractual and fiduciary obligations.[11]

### A. The Subcommittee's Proceedings.

In late 1977, the Subcommittee on Small Business Administration and Small Business Investment Company Authority and General Small Business Problems of the United States House of Representatives Committee on Small Business (the Subcommittee) began investigating the meatpacking industry. The Subcommittee held a number of hearings between October of 1977 and July of 1979 to examine particular problems faced by small packers and to determine whether existing legislation ensured continued competition in the industry. At least five witnesses who testified before the Subcommittee discussed or provided information about IBP, in some cases specifically charging IBP with anticompetitive conduct. The Subcommittee's investigator also gathered additional information about IBP by examining the Bagley Documents, which were subpoenaed in late 1978, and by questioning Bagley under subpoena in January and June of 1979 in preparation for hearings before the Subcommittee.

### B. The Subcommittee's Invitation to IBP.

On June 29, 1979, Congressman Neal Smith from Iowa, chairman of the Subcommittee, invited IBP to send a spokesperson to testify before the Subcommittee during hearings scheduled for late July. In a letter to IBP's president, Robert Peterson, Congressman Smith wrote,

> I wish to take this opportunity to offer you or any other officer who has personal knowledge of the firm's activities and who can speak on behalf of Iowa Beef Processors the opportunity to voluntarily appear and testify before the Subcommittee. Such a hearing would be conducted pursuant to the Rules of the Committee on Small Business, a copy of which is included with this letter. Essentially, the witness or witnesses appearing on behalf of Iowa Beef Processors would have the opportunity to appear under oath and present a written statement of reasonable length which would be made a part of the Subcommittee's hearing record. Following the submission of this written statement and an oral presentation of reasonable length, the witness or witnesses appearing on behalf of Iowa Beef Processors would be questioned by members of the Subcommittee.

Congressman Smith went on to advise Peterson that "the questions can be expected to cover a broad range of topics and issues pertinent to the Subcommittee's inquiry[,] * * * undoubtedly includ[ing] matters raised by the so-called 'Bagley documents'

---

**10.** In addition to Bagley, IBP named as defendants Stern and certain representatives of the Meat Cutters Union, lawyers Krieger, Hawkins, and Cochrane, and Hans Aarsen. IBP claimed, among other things, that Aarsen breached his fiduciary duty to IBP and that the others "intentionally, willfully and maliciously induced" Bagley to breach his termination agreement and "intentionally, willfully and maliciously caused and assisted" in Bagley's breach of his fiduciary duty to IBP. IBP dismissed all claims against these defendants in June of 1982.

**11.** The district court heard IBP's claim for injunctive relief at the same time that Bagley's claims were tried to a jury. The court ultimately rejected this claim. This ruling is the subject of another appeal, *In re IBP Confidential Business Documents Litigation*, 754 F.2d 787 (8th Cir. 1985), which we resolve in a separate opinion.

* * *." In closing, Congressman Smith wrote:

As you know, a great deal of testimony received by this Subcommittee has been in regard to Iowa Beef Processors. If new legislation or rules are enacted to limit dominance by any companies in the meat industry or to ensure that enough competition remains in the industry to prevent undesirable economic consequences, it is clear that Iowa Beef Processors will be one of the companies most affected.

IBP did not respond to Congressman Smith's invitation before the Subcommittee reconvened on July 23, 1979. At that time, in his opening statement, Congressman Smith explained:

In the next several days we will closely examine certain areas of conduct in the industry in an attempt to learn how IBP, the largest meat packing company in the world, moved to its present position as the largest in the industry and with further expansion planned. Appearing under subpoena will be Hughes Bagley, a former vice president of IBP. We also will be introducing certain records and documents which we believe strongly corroborates [sic] the testimony which Mr. Bagley has given to the committee staff.

Congressman Smith went on to observe that,

It is apparent that much of this testimony during the next two days will focus directly on IBP. We wish to be sure to give everyone an opportunity to speak to this committee in our search for the truth. Accordingly on June 29, 1979, I wrote a letter to the President of IBP, Mr. Robert Peterson, inviting IBP to appear before this committee and present testimony under oath, after which time IBP would be questioned by members of the committee. While I am not criticizing them for not having done so, IBP has not yet responded to my invitation. The invitation is still open and I am assuming that we will be hearing from IBP in the next two or three days.

### C. Bagley's Testimony.

Only Bagley testified before the Subcommittee at the July 1979 hearings. In his opening statement, Bagley told the Subcommittee that while he worked at IBP, he "found reason to question" some of IBP's marketing practices. Bagley further explained that when he examined the Aarsen Documents in 1976, he "could see that somebody somehow had to stand up and be counted, or IBP was going to swallow up all of its smaller competition." He therefore agreed to meet with Krieger and the others: "I felt that [the lawyers] might be a starting point of my becoming involved in at least trying to prevent a massive takeover by IBP of the packing industry." In closing, Bagley stated:

I feel sincerely that IBP has been responsible for some great innovations in the meat industry which have been for the common good of all segments of our business; however, I also believe that the company has in the past become overly zealous in its attempts to control and monopolize the packing industry.

In response to questions by Congressman Smith and others, Bagley identified three particular instances of potentially "overly zealous" behavior by IBP. First, Bagley explained that when he joined the Company in 1971, IBP understated its yield (the amount of salable meat it obtained from a beef carcass) in its pricing formula, and by this understatement artificially inflated the price of its boxed beef. To remedy this overpricing without attracting attention from its customers, IBP began to increase gradually its stated yield. Despite this gradual rise, the yield, according to Bagley, still presented "a problem" for IBP when he left in 1975. Second, Bagley told the Subcommittee that until the fall of 1974, IBP offered its Cattle-Pak [12] at "special prices" to Waldbaum, a New York supermarket chain, and, in addition, did not

---

**12.** Cattle-Pak is IBP's registered trademark for its product consisting of the four primal cuts from a whole beef carcass—loins, ribs, rounds and chucks—sold in boxes as a unit.

hold Waldbaum accountable for periodic increases in service fees. Finally, Bagley claimed that IBP instituted a quantity discount program for certain Cattle-Pak customers in late 1971 and continued the program at least through June of 1975, despite serious reservations about its ability to justify the discount on the basis of its costs. By these assertions, Bagley apparently implied that IBP favored certain customers in its pricing policies.

### D. IBP's Response.

In a letter dated August 1, 1979, IBP declined Congressman Smith's invitation to testify. The letter sharply criticized Congressman Smith and his conduct of the Subcommittee's investigation. IBP accused Smith of "demonstrable prejudice" against IBP and "obvious ulterior motives" —"to make political capital" and "to aid a friend and political crony," presumably Lex Hawkins, in antitrust litigation against IBP. Explaining its decision to reject Smith's invitation, IBP wrote:

Because of your plain prejudice against us and your unwillingness in the past to abide by due process and the rule of law, we were initially inclined simply to reject your invitation and, when appropriate, tell our story in the courts or before congressional committees having jurisdiction over the meat industry where we would be fairly treated. But your attacks upon us and the distortions of the truth occurring in your hearings have reached such an extreme that we owe those persons who deal with us on a day-to-day basis and whose trust we have earned over the years a specific rebuttal of the accusations that have been made in your hearings and published by the press. Therefore, while we reject your invitation to appear at your hearings, we submit the following statement to show that our unwillingness to appear results not from an inability to refute the charges made against us, but instead from our firm conviction that we would not be provided a fair forum and would be used as simply another opportunity on your part to grab headlines by anti-IBP accusations. Accordingly, we ask that this letter be made part of the official proceedings of your Subcommittee.

We realize that our rebuttal will not have the least impact on you or on your continuing attacks on this Company, but we hope that open-minded members of your Subcommittee, the media, the cattle and beef industry, and the public who may read it will begin to question and not uncritically accept what you are saying.

In its thirty-one page letter, IBP responded to each charge made against it before the Subcommittee from the fall of 1977 to July of 1979. Approximately fourteen pages of the letter dealt with the charges made by Bagley, whom it characterized as "a disgruntled ex-IBP employee" who had "*stolen* IBP documents and misused IBP confidential information to defame and cause problems for IBP." (Emphasis added.)

Beginning with Bagley's charge of yield misrepresentation, IBP stated that "[b]ecause the formula and the role of the primal yield are complex, Bagley was able to *conceal the truth* in confusion * * *." (Emphasis added.) In an attempt to elucidate, IBP explained that it guaranteed its customers a price per hundred-weight on its boxed beef, necessarily based, because all cattle are different, on an assumed yield. Although the actual yield varied, buyers were unaffected because they made their purchasing decisions based on the price per hundredweight. In guaranteeing its price based on an assumed yield, IBP took the risk that the actual yield would fall short of the assumed yield, and reaped the benefits when the actual yield exceeded the assumed yield. IBP also maintained that the gradual increase in its stated yields resulted from improved production techniques and leaner, better-yielding cattle, rather than an attempt to correct an earlier misrepresentation as Bagley claimed.

Next, IBP responded to Bagley's allegation of preferential pricing:

> Although Bagley admitted that he did not know the origins or rationale of IBP's Cattle-Pak formula pricing to the Waldbaum chain, he felt free to suggest that it was illegal, below-cost pricing used by IBP as a tool to break into the New York market. The facts are otherwise.

IBP explained that when it finally persuaded Waldbaum to accept boxed beef despite bitter union opposition, it developed a special packaging suitable for the New York market, which required a new and different pricing formula. IBP conceded that Waldbaum's service fees were lower than those of other New York buyers, but attributed this difference to an agreement between IBP and Waldbaum, wherein IBP promised that service fees would not increase in return for Waldbaum's commitment to pioneer in the establishment of Cattle-Pak on the east coast.

Finally, IBP addressed the quantity discount program that Bagley described, stating that "Bagley's version of IBP's quantity discount program is *absolutely false*, and, we believe, *constitutes perjury* for which he should be cited." (Emphasis added.) IBP admitted offering a quantity discount, but asserted that it offered the discount to all its customers that purchased the requisite quantity. In addition, IBP maintained that it discontinued the program in September of 1973, pending a long-range cost accounting study to identify and quantify those savings "believed to be inherent" in volume purchases. According to IBP, "Bagley was intimately involved in the termination of the program and his attempt to suggest that it was not then terminated is *clear perjury.*" (Emphasis added.) IBP went on to say that "Bagley *again perjured himself* by suggesting that [certain rebate checks] had anything to do with the [quantity discount program] * * * [emphasis added]. As Bagley well knows, that occasion represented a special one-time price reduction program under which IBP rebated $8 per head to *all* customers

purchasing *any* quantity of Cattle-Pak during [a given period]."

In closing, IBP stated, "we have demonstrated that Bagley's stories about illegal or questionable conduct by IBP are false." IBP went on to say that Bagley's claim that he met with Krieger and others "to prevent a massive take-over by IBP of the packing industry" was

> simply a fabrication to conceal the malice with which he sought to stir up trouble for IBP and to create a defense for IBP's breach-of-fiduciary-duty suit.

> * * *

> Now, you have furthered his vendetta by providing him with a privileged forum in which to make his false representations and disclose confidential IBP documents and information. Bagley's testimony before your Subcommittee must be recognized as nothing but a malicious attempt to blacken IBP's name and belatedly manufacture a defense to IBP's breach-of-fiduciary duty [sic] suit.

### E. Dissemination of IBP's Response.

IBP addressed its letter to Congressman Smith and sent copies to seventeen other members of the Subcommittee. The Subcommittee, contrary to IBP's explicit request, did not enter the letter into the record; nor did it formally release the letter to the news media. IBP also refused initially to release copies of the letter, but referred those requesting copies to members of the Subcommittee who had received copies or certain organizations that IBP learned had subsequently obtained copies. By mid-September of 1979, the media had widely reported IBP's response. Thereafter, IBP did, upon request, give copies of the letter to certain members of the news media.

In late 1979, IBP distributed additional copies of its response as part of a bound document containing IBP president Peterson's testimony before the Livestock and Grains Subcommittee of the House Agriculture Committee (Livestock Subcommittee). IBP sent this document to members of the Livestock Subcommittee, IBP's directors,

officers, and plant managers, certain members (primarily officers) of various agricultural associations (for example, National Cattlemen's Association, Central States Association, Texas Cattle Feeders Association, National Pork Producers, American Farm Bureau), professors at several academic institutions, approximately fifty members of the news media, and other interested parties. IBP prefaced the document with a letter, explaining to each "Supplier, Customer or Other Business Friend of IBP,"

> Since you have a legitimate interest in the subject matter, we are making this document available to you. It is for your personal use (and/or the use of your company), and is not intended for republication or distribution to the general public. * * * [W]e want you to know the truth and not be misled by false accusations.

## II. DISCUSSION.

### A. Libel and the People's Right to Petition.

The first amendment guarantees "the right of the people * * * to petition the Government for a redress of grievances." This case requires us to consider, for the first time, to what extent this constitutional guarantee limits a court's power to award damages for libel in an action predicated on nontestimonial communications made in the course of petitioning the government.

■ The people's right to petition the government for a redress of grievances is "among the most precious of the liberties safe-guarded by the Bill of Rights." *United ed Mine Workers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). It is "implicit in and fundamental to the very idea of a republican form of governance." *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1342 (7th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977) (citing *United States v. Cruikshank*, 92 U.S. (2 Otto) 542, 552, 23 L.Ed. 588 (1875)). The government acts on behalf of the people and, "to a very large

extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137, 81 S.Ct. 523, 529 (1961).

Sharing the "preferred place" accorded the first amendment freedoms in our system of government, the people's right to petition "has a sanctity and a sanction not permitting dubious intrusions." *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945).

> "For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it."

*New York Times Co. v. Sullivan*, 376 U.S. 254, 297, 84 S.Ct. 710, 735, 11 L.Ed.2d 686 (1964) (Goldberg, J., concurring in result) (quoting 1 Tucker, Blackstone's Commentaries (1803), 297 (editor's appendix)). Preserving inviolate the people's right to petition the government is imperative "to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." *DeJonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937).

IBP unquestionably exercised its first amendment right to petition the government when it wrote to Congressman Smith and sent copies of that letter to other members of the Subcommittee. For nearly two years, the Subcommittee had investigated the meatpacking industry, of which IBP is a prominent member. During the hearings, witnesses specifically testified as to IBP's activities and intentions, in some cases charging IBP with specific acts of misconduct. By mid-1979, when Bagley

testified, the Subcommittee had seemingly focused on IBP. Explicitly recognizing this in his letter, Congressman Smith invited IBP to respond,[13] warning it that if the investigation resulted in legislation, it would be one of the companies "most affected."

In its letter, which IBP requested be included in the record,[14] IBP limited its discussion to issues directly relevant to the Subcommittee's investigation. IBP responded to the specific charges of misconduct made by witnesses who testified before the Subcommittee, explaining its own position and exposing the witnesses' potential biases and motives. In addition, IBP questioned the integrity of the investigation itself—charging Smith with improper motives, condemning his allegedly biased choice of witnesses, and criticizing the practices he employed to gain access to the Bagley Documents.

[2, 3] We believe that IBP also acted well within the scope of its first amendment right to petition when it selectively distributed copies of its letter to those who had a legitimate interest in the issues raised during the course of the Subcommittee's investigation. The right to petition means more than simply the right to communicate directly with the government. It necessarily includes those activities reasonably and normally attendant to effective petitioning. *See, e.g., Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. at 142–43, 81 S.Ct. at 532; *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir.1983). In this case, we need not delineate the outer limits of this right. The right to respond to charges of misconduct made before a congressional subcommittee necessarily includes some right to disseminate this response to those who learned of the charges. To hold otherwise would render the right to

respond virtually meaningless, particularly in a case such as this where the governmental body to whom the response was directed chose not to publicize it. The record in this case shows that IBP's limited publication of its response did not exceed the bounds of reasonableness.

Concluding that IBP was exercising its first amendment right to petition the government, we must next examine to what extent that right protects IBP from liability for the allegedly libelous statements it made in the course of petitioning. We begin by recognizing that "there is no constitutional value in false statements of fact," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), even if made in the course of petitioning the government. Factual misstatements, whether intentional lies or careless errors, do not inform; they confuse and mislead.

Although not worthy of constitutional protection, erroneous statements of fact arise inevitably in the course of free and open communication between citizen and government. Punishing all such errors, whether by sanction or civil liability, would induce a cautious and restrictive exercise of the constitutionally guaranteed right to petition. Requiring citizens to guarantee the accuracy of statements made in the course of petitioning the government, at the risk of multimillion dollar libel judgments, would lead to intolerable self-censorship, deterring not only falsity but truth as well. As the Supreme Court recognized in *Gertz v. Robert Welch, Inc., supra*, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." 418 U.S. at 341, 94 S.Ct. at 3007.

### 1. Absolute Privilege.

A witness actually testifying before a legislative committee, like a witness testi-

---

**13.** For purposes of determining whether IBP exercised its first amendment right to petition the government, we deem it irrelevant that IBP wrote a letter, rather than sending a spokesperson to appear before the Subcommittee as Congressman Smith had requested.

**14.** That Congressman Smith elected not to include the response in the record is, we believe, also irrelevant for purposes of determining whether IBP exercised its first amendment right to petition the government.

fying in court, enjoys absolute immunity from liability for defamation for statements made that are pertinent to the subject of inquiry or responsive to questions asked. *See, e.g., Bio/Basics International Corp. v. Ortho Pharmaceutical Corp.,* 545 F.Supp. 1106, 1115 (S.D.N.Y.1982) (applying common law of New York); *Jennings v. Cronin,* 256 Pa.Super. 398, 389 A.2d 1183, 1185 (1978); *Logan's Super Markets, Inc. v. McCalla,* 208 Tenn. 68, 343 S.W.2d 892, 894–95 (1961); *Sherrard v. Hull,* 53 Md.App. 553, 456 A.2d 59, 63, *aff'd mem.,* 296 Md. 189, 460 A.2d 601 (1983) (relied not on the common law privilege but on the first amendment right to petition). *See generally* 53 C.J.S. *Libel and Slander* § 105 (1948); W. Prosser, *Law of Torts,* § 114, at 781–82 (4th ed. 1971). The Supreme Court of Appeals of West Virginia, in *Webb v. Fury,* 282 S.E.2d 28 (W.Va. 1981), extended this absolute immunity from defamation liability to all communications made in the course of petitioning the government, whether or not such communications were made in the confines of an actual proceeding. In so doing, the West Virginia court relied on the so-called *Noerr-Pennington* doctrine.

The *Noerr-Pennington* doctrine finds its origin in the Supreme Court's 1961 decision in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra.* There, a group of trucking companies and their trade association brought an action against a group of railroads, a railroad association and a public relations firm, alleging that the railroads had violated the Sherman Act by conducting a publicity campaign "designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers." *Id.* 365 U.S. at 129, 81 S.Ct. at 525. The Supreme Court concluded that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136, 81 S.Ct. at 528. In so concluding, the Court relied in part on its determination that, in light of the constitutionally guaranteed right to petition, a contrary conclusion "would raise important constitutional questions." The Court recognized, in closing, that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533.

Ten years after *Noerr,* the Supreme Court explained the decision as resting squarely on the constitutionally guaranteed right to petition the government. In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), one group of highway carriers brought an action against another group of highway carriers, alleging that the defendants violated the Sherman Act by instituting state and federal administrative and judicial proceedings to resist and defeat plaintiffs' applications to acquire, transfer, or register operating rights. Relying entirely on the people's right to petition and of association, the Court reiterated that mere attempts to influence the passage or enforcement of laws do not violate the Sherman Act. *Id.* at 510–11, 92 S.Ct. at 611–12. The Court remanded the case for trial, however, because it concluded that the allegations in the complaint, which the district court dismissed, on their face fell within the "sham" exception recognized in *Noerr.* The complaint alleged that defendants set up a trust fund to finance opposition to all plaintiffs' applications "with or without probable cause and regardless of the merits." *Id.* at 518, 92 S.Ct. at 615. The Court held that this, if true, constituted a violation of the antitrust laws: "A combination of entrepreneurs to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts, to defeat that right by massive,

concerted, and purposeful activities of the group are ways of building up one empire and destroying another." *Id.* at 515, 92 S.Ct. at 614.

West Virginia's Supreme Court of Appeals in *Webb v. Fury, supra,* relied on the *Noerr-Pennington* doctrine to issue a writ of prohibition preventing a trial court from proceeding with a defamation action. There, the allegedly libelous communications included an administrative complaint lodged with the United States Department of Interior's Office of Surface Mining (OSM) and a request for an evidentiary hearing before the United States Environmental Protection Agency (EPA). These communications charged the plaintiff, a coal company, with violating federal law and, according to the plaintiff, were made maliciously and with knowledge of their falsity. The West Virginia court concluded that these communications constituted "classic examples" of petitioning activity and, as such, were absolutely privileged under the *Noerr-Pen-nington* doctrine. The court described the doctrine as "a principle of constitutional law which bars litigation arising from injuries received as a consequence of first amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs." 282 S.E.2d at 37. The state court rejected the plaintiff's contention that the defendant's activities were not entitled to protection because they fell within the "sham" exception. *Id.* at 39.

Justice Neely, dissenting, asserted that the majority overstated the reach of the *Noerr-Pennington* doctrine. He rejected the conclusion that the doctrine created blanket immunity for all activities that look like petitioning, relying on the "sham" exception. This exception, according to the dissent, "uncovers from immunity *any* course of conduct which in fact is not petitioning activity, despite its appearance." *Id.* at 46. When putative petitioners know there is no basis for their claims, the dissent concluded, they are not petitioning the

government, and if they are not petitioning the government, they are not entitled to immunity.

We agree with Justice Neely that the *Webb* majority overstates the reach of the *Noerr-Pennington* doctrine.[15] Courts have indeed extended the doctrine beyond the antitrust context to a limited extent. For example, certain efforts to influence the government do not give rise to liability for tortious interference with business. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982) (economic boycott of white merchants designed to secure elected officials' compliance with demands for racial equality and integration); *Havoco of America, Ltd. v. Hollobow,* 702 F.2d 643, 650 (7th Cir.1983) (defendant investors initiated an investigation by the Securities and Exchange Commission which forced plaintiff to postpone its planned public offering); *Suburban Restoration Co. v. AC-MAT Corp.,* 700 F.2d 98, 102 (2d Cir.1983) (defendant successfully sought an injunction against city officials preventing the award of a public contract to a competitor); *Missouri v. National Organization for Women, Inc.,* 620 F.2d 1301, 1315 (8th Cir.) (convention boycott against Missouri to encourage ratification of the proposed equal rights amendment), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980); *First National Bank v. Marquette National Bank,* 482 F.Supp. 514, 524–25 (D.Minn.1979) (defendant successfully lobbied for legislation restricting plaintiff's right to engage in a bank credit card program), *aff'd,* 636 F.2d 195, 197 (8th Cir. 1980), *cert. denied,* 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981); *Sierra Club v. Butz,* 349 F.Supp. 934, 938 (N.D.Cal.1972) (defendants sought to persuade the government to abandon its intention to permit logging in a particular wilderness area, despite a preexisting contract allowing plaintiff to harvest timber in that area). In addition, courts have extended the *Noerr-Pennington* doctrine to immunize defend-

---

**15.** We have said in the past that "the basis of this doctrine is not an all-encompassing First Amendment protection." *International Travel*

*Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1267 n. 14 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980).

ants seeking to influence government action from liability for alleged conspiracies under 42 U.S.C. § 1983, *see, e.g., Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 615 (8th Cir.1980) (defendants successfully petitioned the city's board of directors to rezone a particular site to prevent plaintiffs from constructing a high rise apartment complex on that site) and 42 U.S.C. § 1985, *see, e.g., Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1344 (7th Cir.) (defendant corporation filed an allegedly false complaint with the Internal Revenue Service charging the plaintiff, the agent who conducted its audit, with professional misconduct), *cert. denied* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

This limited extension of the *Noerr-Pennington* doctrine does not support the conclusion that one who seeks to influence governmental action escapes liability for any and all injuries inflicted in the course of genuine petitioning activity. Rather, it simply establishes that courts may not award compensation for the consequences of protected activity. Courts can and do award damages for injuries inflicted as a result of unprotected activity.

The cases establish, in our view, two classes of unprotected activity. The first constitutes those activities which come within the "sham" exception. These are activities which, although "ostensibly directed toward influencing governmental action," are actually nothing more than an attempt to harm another. *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. The Fifth Circuit, in *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286, 1297–98 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), relied on the "sham" exception to hold *Noerr-Pennington* inapplicable to allegedly false communications directed to the government. That court, like the *Webb* dissent, reasoned that false communications cannot be considered an attempt to influence governmental policies and thus do not constitute genuine petitioning activity.

The other class of unprotected activity includes those activities which do not qualify for protection even if undertaken in a genuine attempt to influence governmental policy. The first amendment does not protect violence. *Noerr-Pennington,* therefore, does not preclude tort liability for business losses caused by violence that is part of an otherwise legitimate economic boycott. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. at 916, 102 S.Ct. at 3428. Similarly, the first amendment affords no protection to illegal acts. Thus, courts have held that *Noerr-Pennington* does not immunize a defendant from liability for injuries resulting from governmental action secured by illegal means. *See, e.g., Westborough Mall v. City of Cape Girardeau,* 693 F.2d 733, 746 (8th Cir.1982), *cert. denied,* 465 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983); *Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters and Helpers Local No. 150,* 440 F.2d 1096, 1099 (9th Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971). Moreover, the first amendment does not absolutely protect defamatory speech. *See Gertz v. Robert Welch, Inc., supra.* Therefore, *Noerr-Pennington* does not necessarily and absolutely preclude liability for damages resulting from defamatory statements made in the course of petitioning the government. Thus even where federal courts have dismissed other claims on *Noerr-Pennington* grounds, they have declined to hold pendent state law defamation claims precluded by *Noerr-Pennington. See Stern v. United States Gypsum, Inc.,* 547 F.2d at 1345; *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d at 615–16.

We believe extending absolute immunity to all communications made in the course of petitioning the government, whether or not such communications were made in the confines of an actual proceeding, is unwarranted by the *Noerr-Pennington* doctrine and also unwise. Sound considerations underlie the common law's limitation of the absolute privilege's applicability to those who actually testify. In that context, safeguards exist to ensure that absolute immunity from defamation liabili-

ty is not abused. A witness testifies pursuant to the supervision and control of the presiding officer, who may reprimand, fine, and punish the witness as well as strike from the record statements that exceed proper bounds. In addition, a witness testifies under oath and thus is subject to prosecution for perjury.

Extending absolute immunity from defamation liability to situations where alternative safeguards do not exist to prevent attacks upon reputation requires a complete sacrifice of the value served by the law of defamation. Such a sacrifice is, in our view, unacceptable. As Justice Stewart said so well, "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966). Accommodating, to some degree, the state's legitimate interest in redressing wrongful injury to reputation is essential, even when that injury is inflicted during the course of genuine petitioning activity. We reject, therefore, IBP's contention that statements made in the course of petitioning the government are absolutely privileged.[16]

### 2. Qualified Privilege.

Recognizing the importance of petitioning the government, the Court of Appeals for the District of Columbia Circuit has granted a broad common law immunity from liability for defamation in nontestimonial communications directed to the government. *See Webster v. Sun Co.*, 731 F.2d 1

(D.C.Cir.1984). In that case, a Sun Company employee sent an allegedly libelous intra-office memorandum concerning a fuel saving device invented and promoted by the plaintiffs to an employee of the Congressional Research Service who had previously expressed interest in the device. The court concluded that the statements, which it characterized as "unsolicited," were "absolutely privileged" provided that 1) the communicator would not have made the statements but for an intention to inform the legislative body on a subject properly within its jurisdiction, and 2) the statements had some relation to the legitimate legislative business to which they were addressed. *Id.* at 5.[17]

The protection afforded under these common law principles by the *Webster* court is not applicable here because such protection does not extend to republications. In our view, the constitutional right to petition, although not entitled to absolute protection, must afford a citizen under attack by a congressional committee and the committee's witnesses with attendant publicity at least a qualified privilege to respond to such charges and to make reasonable republications thereof. We think that the first amendment protections afforded the press against liability for defamation reflect an analogous principle to be applied here.

Beginning in 1964 with *New York Times Co. v. Sullivan, supra,* the Supreme Court prohibited public officials from recovering damages for defamatory falsehood absent proof that the libelous statement was made with "actual malice"—that is, "with knowl-

---

**16.** Our attention has been directed to the recent case of *Smith v. McDonald*, 737 F.2d 427 (4th Cir.1984), in which the Fourth Circuit also determined that the petition clause does not confer an absolute privilege. The Supreme Court has granted certiorari in the *Smith* case. —— U.S. ——, 105 S.Ct. 502, 83 L.Ed.2d 394 (1984).

**17.** Although purportedly defining the scope of the absolute privilege at common law, the D.C. Circuit in effect created a qualified privilege. An absolute privilege is by definition just that—absolute, without regard to the defendant's pur-

pose or motive or the reasonableness of his or her conduct. W. Prosser, *supra* p. 1311 § 114, at 776. Such a privilege protects the defendant from liability for defamation even if he or she deliberately lies or is motivated purely by personal ill will toward the plaintiff. Neither statement, on the other hand, finds sanctuary under *Webster*. *Webster* protects only those statements made for the purpose of informing the legislature. 731 F.2d at 5. Thus, the privilege approved by the D.C. Circuit is not absolute, but qualified.

edge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 725–26. The Court extended this standard of liability in 1967 to defamation actions brought by "public figures," individuals "who do not hold public office * * * [but] are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in result). In so doing, the Court reasoned that

> "public figures," like "public officials," often play an influential role in ordering society. * * * Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of "public officials."

*Id.* By requiring "public persons" to prove "actual malice" and thus affording a substantial measure of protection from defamation liability to their critics, the Court has provided the necessary insulation for certain of the fundamental interests which the first amendment was designed to protect—the rights of the press and the public to inform and be informed as to the conduct and character of those who play an influential role in ordering society.

▮ We believe that the "actual malice" standard of liability provides the "necessary insulation" for the first amendment interests at stake in this context as well. Requiring plaintiffs to prove, by clear and convincing evidence, *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971) (plurality opinion by Brennan, J.), that statements made in the course of petitioning are made with knowledge that they were false or in reckless disregard of whether they were false or not affords substantial protection to petitioners. "Actual malice" is not measurable simply by reference to the conduct of a reasonably prudent person; rather, "[t]here must be sufficient evidence to per-

mit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Recklessness cannot be inferred from the mere combination of falsehood and the defendant's general hostility toward the plaintiff. *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 10, 90 S.Ct. 1537, 1539, 26 L.Ed.2d 6 (1970).

In *Gertz v. Robert Welch, Inc., supra*, a majority of the Supreme Court recast the rationale behind *New York Times* and its progeny, focusing not on the heightened interest in unfettered discussion with respect to public persons, but instead on the status of the person defamed. Only this way, the Court determined, could it strike an appropriate balance between the competing interests at stake. In so concluding, the Court reiterated its conviction that the *New York Times* privilege should be available to "publishers and broadcasters of defamatory falsehood concerning public officials and public figures." 418 U.S. at 343, 94 S.Ct. at 3008. The decisions in *New York Times* and *Curtis Publishing*, the Court stated, are correct

> but we do not find their holdings justified solely by reference to the interest of the press and broadcast media in immunity from liability. Rather, we believe that the *New York Times* rule states an accommodation between this concern and the limited state interest present in the context of libel actions brought by public persons.

*Id.*

*Gertz* identified two alternative bases for characterizing a person as a public figure for purposes of media comment. In some instances, a person may occupy a position "of such persuasive power and influence" or "achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* at 345, 351, 94 S.Ct. at 3009, 3012. "More commonly, an individual voluntarily injects himself or is drawn into a particular public

controversy and thereby becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. at 3012. In either case, such persons have "assumed roles of especial prominence in the affairs of society" and thus "invite attention and comment." *Id.*

Public persons share two characteristics, according to the Court, which at least theoretically distinguish them from private individuals for purposes of diminishing the state's interest in compensating them for injuries to their reputations. First, public persons are less vulnerable to injury because they "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344, 94 S.Ct. at 3009 (footnote omitted). Second, having assumed the risk of public scrutiny by becoming involved in public affairs, public persons are less deserving of recovery than are private individuals.

■■■ For purposes of this case, we need not decide whether Bagley is a limited public figure within the meaning of *Gertz* —that is, for purposes of media comment. He is, in our view, analogous to a limited public figure in the context of petitioning the government. A limited public figure, by playing an influential role in resolving a public controversy, invites media attention and comment germane to his participation in that controversy. Similarly, Bagley, by playing an influential role in the legislative process, invited attention and comment germane to his participation by others also participating in that process.

Bagley's testimony before the Subcommittee in July of 1979, like his earlier cooperation in preparation for the hearing, was given pursuant to a subpoena and thus cannot objectively be characterized as voluntary. Prior to that time, however, he did assume a voluntary role in the ongoing controversy as to whether and, if so, to what extent IBP was engaging in anticompetitive conduct. As we have previously observed, Bagley voluntarily met and cooperated with several antitrust lawyers, sharing with them information he gained during his tenure at IBP and allowing them to examine the Bagley Documents. He did so, according to his own testimony before the Subcommittee, because he "could see that somebody somehow had to stand up and be counted, or IBP was going to swallow up all of its smaller competition." He thought that talking with the lawyers "might be a starting point of [his] becoming involved in at least trying to prevent a massive takeover by IBP of the packing industry." In addition, Bagley, although under subpoena, can hardly be described as a recalcitrant and unwilling witness.

Like a limited public figure suing a media defendant for defamation, Bagley's status as an active participant in the legislative process diminishes the state's interest in protecting him from defamation by another participant. As a participant, he has proven access to the forum in which he was allegedly defamed. He therefore has a realistic opportunity to counteract false statements, minimizing the adverse impact on his reputation. In addition, unlike publication by the communications media, the defamation itself occurs here in a limited forum, markedly reducing the scope of the injury. Depending on the nature of the proceeding and the charges made, the media may, as it did in this case, relay the communication to the general public. When this happens, however, the response will frequently be equally newsworthy. All these considerations render a participant in legislative proceedings less vulnerable to injury from defamation than one who is in no way involved. Thus the state's interest in protecting a participant is reduced. In addition, persons who through their own actions are in a position to influence the legislative process must accept the risk of scrutiny by other participants in the process. Having accepted the risk, they are less deserving of recovery for injury as a result of defamatory falsehood.

■■■ For all these reasons applicable to Bagley, whose status we have said is analogous to a limited public figure in me-

dia comment, we conclude that the "actual malice" standard of liability applies here and that standard is an appropriate accommodation between society's interest in immunity from defamation liability for those who communicate with the government and the limited state interest in compensating the other participants for defamation in that context.[18] Having so concluded, we must reverse the libel judgment. Proving that a statement was made with "actual malice"—that is, with knowledge that it was false or in reckless disregard of its falsity—necessarily includes proving the statement was false. In this case, the instructions absolved Bagley of his initial burden of proving falsity. The district court instructed the jury that the defamatory statements in IBP's letter were libelous per se. This, according to the court, created "a legal presumption of their falsity thus shifting to [IBP] the burden of proving the truth of the statement." The punitive damages instruction, which required proof of "actual malice"[19] did not cure or render harmless this error. This instruction related to damages only, not to liability, and became relevant to the jury's deliberation only after it determined liability under the instructions pertaining to libel. Furthermore, the punitive damage instruction contained error in that it failed to clearly place the burden of proving actual malice by clear and convincing evidence on Bagley.

IBP argues that Bagley cannot prove "actual malice" as a matter of law. We decline to decide that issue at this time. Although it lies well within our appellate power in the first amendment area to do so, see, e.g., New York Times Co. v. Sullivan, 376 U.S. at 284–86, 84 S.Ct. at 728–29; Greenbelt Cooperative Publishing Association v. Bresler, 398 U.S. at 11, 90 S.Ct. at 1540, we believe that in this case that determination should be left to the district court on remand. That court presided over twelve days of trial, gaining a far superior vantage point from which to view the evidence and determine whether Bagley introduced evidence of "actual malice" sufficient to merit jury consideration. If the district court decides that Bagley did not introduce sufficient evidence of actual malice to merit jury consideration, it should then enter judgment for defendant on the libel claim notwithstanding the verdict. If it decides that he did introduce sufficient evidence on this subject, there should then be a new trial on the libel claim, with instructions to be given in accordance with our opinion.

## B. Tortious Interference with Employment.

At the time he testified before the Subcommittee, Bagley worked for Dubuque Packing Company (Dubuque), a company that both competed and dealt with IBP.[20]

18. The Supreme Court reached a similar conclusion, but based on the common law instead of the first amendment, in *White v. Nicholls,* 44 U.S. (3 How.) 266, 11 L.Ed. 591 (1845). In that case, the Court recognized that, at common law, petitions to government for redress of grievances were privileged communications. However, that privilege was not absolute. The Court stated: "[P]roof of express malice in any written publication, petition, or proceeding, addressed to [a court or legislative body], will render that publication, petition, or proceeding, libelous in its character, and actionable, and will subject the author and publisher thereof to all the consequences of libel. * * * [F]alsehood and the absence of probable cause will amount to proof of malice." *Id.* at 291.

19. The punitive damages instruction provides in part:

> If you find that plaintiff has established the essential elements of his libel claim and if you find, on the basis of clear and convincing evidence that the defendant acted with actual malice in publishing the writing in question, then you may award the plaintiff punitive damages in addition to the actual damages assessed.

The district court further instructed the jury that "[a] publication is made with 'actual malice,' as that term is used in this charge, if it is made with knowledge that it is false, or with reckless disregard of whether it is false or not."

20. From mid-1974 to at least the time of trial, IBP and Dubuque had a mutually beneficial arrangement, designed to avoid transportation expense and to ensure a consistent supply of carcasses for their fabricating plants and a consistent demand for carcasses from their slaughtering plants. In essence, IBP agreed to supply

Dubuque had employed Bagley since early 1979 as general manager of one of its fabricating plants, primarily responsible for marketing and selling Dubuque's boxed beef. On July 30, 1979, six days after Bagley testified, Dubuque discharged him, along with about ninety other employees, explaining that Dubuque intended to cut back on its boxed beef operation. With one six-month exception,[21] Bagley has not been employed since, despite several hundred applications and inquiries.

At trial, Bagley maintained that his discharge by Dubuque and his subsequent inability to obtain other employment resulted from IBP's tortious interference with his existing and prospective employment relationships. The jury agreed, awarding Bagley $650,000 compensatory and punitive damages for interference with his employment at Dubuque and $350,000 compensatory and punitive damages for interference with prospective employment. On appeal, IBP argues that both these verdicts must fall because they are "hopelessly tainted by the libel and privacy portions of the trial."

■ Although we reject this argument, we do believe that the verdict for interference with prospective employment must fall. The only evidence in the record that arguably constitutes interference with Bagley's prospective contractual relationships is IBP's publication and circulation of the allegedly libelous letter. For that reason, Bagley's inability to obtain subsequent employment is more appropriately characterized as an element of damages for libel and an award upon any separate claim could well be a duplication of damages. If, on remand, Bagley establishes IBP's liability for libel, he should be allowed to recover for the adverse impact on his future employability.

■ The evidence supporting Bagley's claim of tortious interference with existing employment, on the other hand, is entirely independent of the alleged defamation. On two different occasions, IBP executives spoke with Charles Stolz, the president of Dubuque, and indicated their displeasure about the employment relationship then existing between Bagley and Dubuque. In the spring of 1979, IBP's president, Robert Peterson, told Stolz that he and other IBP employees were "uncomfortable" dealing with Bagley because of their ongoing dispute. Later that year, just before Bagley was to appear before the Subcommittee, the co-chairman of IBP's board of directors reminded Stolz, in a manner that Stolz characterized as "joking," that Dubuque was paying Bagley while he testified against IBP. Because this evidence presents a basis entirely independent of the alleged libel upon which. the jury could reasonably conclude that IBP caused Dubuque to discharge Bagley, we believe that the judgment for tortious interference with existing employment must stand.

### C. Fair Trial.

IBP also contends that the district court denied it a fair trial by allowing the introduction of prejudicial and irrelevant evidence and by permitting improper closing argument. After carefully reviewing the record, paying particularly close attention to IBP's specific allegations of error, we cannot agree.

The admission or exclusion of evidence and the latitude afforded counsel in jury argument necessarily lie within the sound discretion of the district court. *Skogen v. Dow Chemical Co.*, 375 F.2d 692, 704–05 (8th Cir.1967). Our role is limited to reviewing for a clear abuse of discretion by the district court. *Wilfing v. General Motors Corp.*, 685 F.2d 1049, 1052 (8th Cir. 1982). We give great deference to the judge who saw and heard the evidence and the arguments. *United States v. Bohr*, 581 F.2d 1294, 1299 (8th Cir.), *cert. denied,*

---

carcasses from its slaughtering plant in Denison, Iowa to Dubuque's Denison processing plant and to buy carcasses for its fabricating plant in Dakota City from Dubuque's nearby slaughtering facilities.

**21.** Bagley worked as president of Southwest Beef from June to December of 1981, when the company closed its plants.

439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). That judge, not this court, has "the feel of the case" and thus has "a superior vantage point from which to oversee the factual presentation of the case and the conduct of counsel." *Skogen v. Dow Chemical Co.*, 375 F.2d at 705–06.

 We reject IBP's contention that the trial court's admission of evidence deprived it of a fair trial. We do not believe that the closing argument presented by Bagley's attorney so exceeded proper bounds as substantially to affect the fairness of the trial as a whole. Our affirmance on this issue, however, is not binding on remand. The previous trial and now this appeal have, in our view, crystallized the issues in this case. It may well be that on retrial the district court will find it expedient to reconsider the probative value of particular pieces of evidence and once again determine whether that value is outweighed by the danger of unfair prejudice.

### D. Prejudgment Interest.

In this diversity case, Iowa law governs the amount of prejudgment interest due on the judgment. *Sedco International, S.A. v. Cory*, 683 F.2d 1201, 1212 (8th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). Section 535.3 of the Iowa Code provides that "[i]nterest shall be allowed on all money due on judgments and decrees of courts at the rate of ten percent per year * * *. The interest shall accrue from the date of the commencement of the action." Iowa Code Ann. § 535.3 (West Supp.1984–1985).[22] Pursuant to the statute, the district court awarded Bagley prejudgment interest on the entire judgment in the amount of $2.33 million. IBP contests this award on a number of grounds. Because of our disposition of this case, we need address only those arguments which

are relevant to the district court's award of prejudgment interest on the $650,000 judgment for tortious interference with existing employment.[23]

 First, IBP argues that if any of Bagley's damages were sustained after the complaint was filed, interest should have accrued only from the date of injury, despite the language in section 535.3. *See Sedco International, S.A. v. Cory*, 683 F.2d at 1211–12. The problem in this case is determining whether the $150,000 compensatory damage award for tortious interference with existing employment was for damages incurred before or after October 4, 1979, when the complaint was filed. In the absence of evidence to the contrary, we must assume that the losses for which Bagley was being compensated by this judgment occurred when he was discharged on July 30, 1979 and immediately thereafter. Such an assumption is particularly warranted where, as in this case, there was a separate compensatory damage award for tortious interference with future employment. Thus, we reject this contention by IBP.

IBP also argues that prejudgment interest on future damages was inappropriate because the district court instructed the jury to calculate the present value of Bagley's future damages. For reasons already discussed, we are assuming that the $150,000 compensatory damage award was for past injury. We therefore need not address the merits of this argument.

 Finally, IBP argues that prejudgment interest does not run on punitive damages before judgment. The district court rejected this argument, relying on the "clear mandate" in section 535.3 that interest on all judgments "shall accrue from the date of the commencement of the action."

---

**22.** The statute, amended to its present form on March 28, 1980, applies to judgments entered on and after January 1, 1981, even if the action was filed prior to that date. *Janda v. Iowa International Hydraulics, Inc.*, 326 N.W.2d 339, 343–44 (Iowa 1982).

**23.** In addition to the arguments discussed below, IBP contends that prejudgment interest on libel judgments impermissibly chills speech and improperly compels retraction and settlement. Because we reverse the libel judgment, we do not address this issue. If the occasion arises, IBP may raise this issue anew before the district court on any retrial.

Although the statute on its face admits of no exception for punitive damage awards, we cannot agree with this construction. Interest is compensation for the deprivation of the use of money. Punitive damages do not accrue, however, until they are awarded in a judgment. It would be anomalous indeed to compensate the plaintiff for the deprivation of the use of money to which he has no claim of right. Recently, the Supreme Court of Iowa has held, in accordance with decisions issued before enactment of section 535.3 that interest does not run on punitive damages before judgment. *Midwest Management Corp. v. Stephens*, 353 N.W.2d 76, 82 (Iowa 1984).

## III. CONCLUSION.

Having concluded that Bagley cannot recover for defamation on the basis of IBP's letter to the Subcommittee absent "actual malice," we reverse the libel judgment and remand that claim to the district court. We also reverse the judgment for tortious interference with future employment. If, on remand, Bagley successfully establishes IBP's liability for libel, he should be allowed to recover damages for loss of future employability resulting from the defamation. Finally, we affirm the judgment for tortious interference with existing employment totalling $650,000, with prejudgment interest calculated only on the compensatory damages of $150,000.[24] We remand for modification of the judgment, for a determination by the district court, pursuant to IBP's motion for judgment NOV, of whether Bagley introduced sufficient evidence of actual malice to merit consideration by the jury, and for such further proceedings as may be appropriate in light of this opinion. The parties shall bear their own costs on appeal.

FAGG, Circuit Judge, dissenting.

I accept the basic analytic framework developed by the court. Like the court, I conclude that I.B.P.'s actions constitute legitimate petitioning activities that are entitled to some degree of first amendment protection. I also agree with the court that the first amendment does not absolutely insulate I.B.P.'s actions from liability for defamation, but rather provides these actions with a qualified privilege that may be lost under some circumstances. Further, to determine the scope of this qualified privilege, the court must focus on the status of the person defamed; and if the person defamed is a limited purpose public figure, that person must prove "actual malice" in order to overcome the qualified privilege and recover.

Despite basic agreement with the court's approach, I disagree with its conclusions. Unlike the court, I conclude that Bagley's actions have not stripped him of his status as a private individual. Further, even if Bagley has become a limited purpose public figure and as a result is required to prove "actual malice," the district court in fact instructed the jury on the issue of actual malice and the jury specifically found that I.B.P. acted with actual malice. This finding was separate and distinct from any other issue decided by the jury, and after an independent review of the evidence, *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964), I conclude that Bagley presented clear and convincing evidence of actual malice, *Bose Corp. v. Consumers Union of the United States*, —— U.S. ——, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984). Finally, I disagree with the court's reversal of the jury's award of damages on Bagley's interference with future employment claim. While such an award will be duplicative if Bagley ultimately succeeds on his libel claim, Bagley has yet to do so. Consequently, any decision on the propriety of this award is premature. Because of these basic disagreements, I respectfully dissent.

The court's conclusion that Bagley is a limited purpose public figure flows largely

---

**24.** No issue has been raised on appeal concerning the rate applied to post-judgment interest which has been calculated under the Iowa statute. For a discussion of the rate applicable to a judgment in federal court, *see The Weitz Co. v. Mo-Kan Carpet, Inc.*, 723 F.2d 1382 (8th Cir. 1983).

from its determination that Bagley played an "active" and "influential" role in the legislative process. *Ante* at 1316. This conclusion, particularly in light of the significant burden such a decision imposes on Bagley, is misplaced. Bagley's only involvement in the legislative process was as a witness before the Smith subcommittee. He had no role in the subcommittee's policy determinations and did not, outside his specific testimony, attempt to lobby or persuade the subcommittee to take any particular action or position. Instead, Bagley made a single appearance before the subcommittee, under subpoena, and provided information relevant to that subcommittee's activity. Outside of this single appearance, Bagley had neither "proven access" to the legislative forum nor a "realistic opportunity" to counteract false statements made by I.B.P. *Ante* at 1316.

Given these facts, I cannot conclude that Bagley played either an "active" or "influential" role in the legislative process. If he did, then virtually every witness appearing before a congressional committee will constitute an "active" and "influential" participant and like Bagley will lose his or her status as a private citizen. A mere witness can hardly be said to play "an influential role" in "resolving" a particular controversy, especially in the context of losing the mantle and protection of private person status. The court's conclusion that such individuals have "accepted the risk" and are "less deserving of recovery" is remarkably harsh and ignores the valuable role these individuals play in our legislative process. This result will discourage citizens with relevant information from coming forward and, as a consequence, Congress will likely be deprived of a valuable source of information. Simply because an individual becomes "involved in or associated with a matter that attract[s legislative] attention" should not mean that this individual is "automatically transformed into a public figure." *Wolston v. Readers Digest Association*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979).

I reach a similar result when I examine Bagley's overall involvement in the I.B.P.

controversy. Throughout this controversy, Bagley sought no public audience. His meetings with other individuals were private and nonpublicized and, in fact, were not initiated by Bagley. Even his congressional testimony was not objectively voluntary since, as the court notes, it was given under subpoena. Further, after his testimony, Bagley conscientiously avoided the media and made no public comment. Finally, any media attention that Bagley may have received following the publication of the Peterson letter cannot transform an otherwise private individual into a limited purpose public figure. Under any analysis, I simply cannot conclude that Bagley has so "thrust [himself] to the forefront of [this] particular public controversy * * * [that] [h]e has relinquished * * * his interest in the protection of his own good name." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). Consequently, unlike the court, I believe Bagley retains his status as a private citizen.

Although it is my contention that Bagley retains the status of a private citizen, the first amendment values implicated by I.B.P.'s petitioning activities are still entitled to constitutional protection. The necessary constitutional protections were enumerated by the Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Gertz*, the Supreme Court outlined the constitutional limitations on a private citizen's right to recover for defamation in the context of media comment. While the present case involves the first amendment right to petition, I believe the constitutional limitations found in the area of media comment are equally applicable to the area of first amendment petitioning.

The constitutional limitations outlined by the Supreme Court in *Gertz* are essentially three-fold. First, although a state may define the appropriate standard of liability for defamation, it may not impose liability without fault. *Id.* at 347, 94 S.Ct. at 3010. Second, unless actual malice has been proven, the private citizen may recover only

actual damages. *Id.* at 349, 94 S.Ct. at 3011. Third, punitive damages cannot be recovered without proof of actual malice. *Id.* at 350, 94 S.Ct. at 3012. In this case, the district court's instructions comply with the *Gertz* limitations and consequently provide I.B.P.'s first amendment interests with "the 'breathing space' that they 'need * * to survive.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 272, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) (quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)).

On the issue of liability, the district court required Bagley to prove by a preponderance of the evidence that I.B.P. "published the [Peterson] letter with *knowledge* that it was false." This instruction meets the *Gertz* fault requirement. The fact that the district court also instructed the jury that words such as "stole" and "perjury" are libelous per se and create a "presumption of * * * falsity" did not relieve Bagley of the burden of proving fault. Despite this presumption, Bagley was still required to prove that I.B.P. published these statements with knowledge that they were false. Falsity and fault are separate and distinct concepts and the Supreme Court has rejected the argument that falsity is necessarily an indication of fault. *See Gertz*, 418 U.S. at 347 n. 10, 94 S.Ct. at 3010 n. 10. *Cf. Bose Corp.*, 104 S.Ct. at 1965.

The district court's instructions are also consistent with the second *Gertz* limitation. On the issue of compensatory damages, the district court, while at one point speaking of a "presumption of injury," specifically limited Bagley's recovery of compensatory damages to those "which were *directly* and *proximately* caused by the alleged libel." This instruction clearly limited Bagley's compensatory damages to those which he could actually establish.

Finally, with respect to the third *Gertz* limitation, the jury was instructed that Bagley could recover punitive damages only if he could prove "on the basis of clear and convincing evidence that the defendant acted with actual malice." The district court defined the term actual malice as "[a] publication * * * made with knowledge that it is false, or with reckless disregard of whether it is false or not." These instructions are consistent with the *Gertz* limitation on the recovery of punitive damages and properly define both the term actual malice, *New York Times, Inc. v. Sullivan*, 376 U.S. at 280, 84 S.Ct. at 726, and the necessary burden of proof, *Rosenbloom v. Metromedia*, 403 U.S. 29, 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971). Further, the court's gratuitous finding that "the punitive damage instruction contained error in that it failed clearly to place the burden of proving actual malice by clear and convincing evidence on Bagley," *ante* at 1317, is inappropriate. I.B.P. concedes in its brief that the district court's instruction placed the burden of proving this issue on Bagley. In addition, I.B.P. has not even raised this issue on appeal.

Even if Bagley is a limited purpose public figure and is required to prove actual malice, I conclude that the jury's verdict should stand. The jury awarded Bagley punitive damages. This award was separate from the award of compensatory damages and was specifically based on the jury's determination that I.B.P.'s actions were motivated by actual malice. This independent determination in and of itself is sufficient to support both the compensatory and punitive damage awards in this case. As was stated by Chief Justice Warren in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967): "Although the 'actual malice' instructions were not also given in connection with the compensatory damage issue, it is difficult to conceive how petitioner could have been prejudiced by that failure in view of the fact that the jury, guided by 'actual malice' instructions awarded * * * punitive damages." *Id.* at 166, 87 S.Ct. at 1997 (Warren, C.J., concurring).

Further, in so far as the district court's presumption of falsity is concerned, this presumption was limited to the issue of

liability for purposes of compensatory damages. The instructions on their face show that this presumption did not carry over to the issue of liability for punitive damages, the determination of which is independent from a determination of liability for compensatory damages. Consequently, any error the district court may have committed is nonprejudicial and may not be used by this court as a basis for disturbing the jury's verdict. *Brewer v. Jeep Corp.*, 724 F.2d 653, 656 (8th Cir.1983) (citing *Paymaster Oil Mill Co. v. Weston*, 610 F.2d 501, 503 (8th Cir.1979)). The court has forgotten that "[w]e have ... come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered 'citadels of technicality.'" *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984) (quoting *Kotteakos v. United States*, 328 U.S. 750, 759, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557 (1946)). I.B.P. received the fair trial to which it was entitled and this court should not, in light of the clear jury finding of actual malice, reverse the jury's determination.

As a final comment, I disagree with the court's reversal of the damages awarded Bagley on his tortious interference with future employment claim. While an award on this claim would be duplicative of a libel recovery, Bagley very simply has yet to recover on his libel claim. Until that recovery occurs, it is difficult to see how the award of damages for tortious interference with future employment can be duplicative. Rather than reversing this award, the court should remand this portion of the action back to the district court subject to the ultimate determination of the libel issue.

I also conclude that there is sufficient evidence, independent of any evidence that might constitute protected petitioning activity, to support this claim. Prior to I.B.P.'s actions, Bagley was highly regarded in the meat industry, had a good reputation for honesty, ability, and integrity, and received numerous offers of employment. Following his congressional testimony, however, Bagley was fired from Dubuque Packing at I.B.P.'s instigation. Additionally, Bagley was effectively "blacklisted" from the industry as a whole by I.B.P. and it was made clear to him that he should look for employment in another industry because he would never work in the meat industry again. The offers of employment stopped and Bagley was unable to obtain further employment in the meat industry. I believe that this evidence is sufficient to support the jury's verdict on the tortious interference with future employment claim.

In conclusion, contrary to the court, I would affirm the awards for libel and tortious interference with future employment.